**Alexandria GLOWACKI, Plaintiff,**

**v.**

**BUFFALO GENERAL HOSPITAL, Defendant.**

**No. 95–CV–0708C(Sc).**

United States District Court, W.D. New York.

April 9, 1998.

Reden & O'Donnell, L.L.P. (Joseph E. O'Donnell, of counsel), Buffalo, NY, for Plaintiff.

Phillips, Lytle, Hitchcock, Blaine & Huber, L.L.P. (Michael R. Moravec, of counsel), Buffalo, NY, for Defendant.

## DECISION and ORDER

CURTIN, District Judge.

Before the court is defendant Buffalo General Hospital's motion for summary judgment (Item 16) and supporting papers (Items 17, 18). Plaintiff Alexandria Glowacki has responded (Items 20, 21, 22), and defendant has replied (Items 26, 27). On December 5, 1997, the parties appeared before the court for oral argument. At oral argument, plaintiff's counsel agreed to drop plaintiff's age discrimination (ADEA) claim.

## *BACKGROUND*

Plaintiff Alexandria Glowacki brings this action against her former employer, defendant Buffalo General Hospital, pursuant to the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, and the New York State Human Rights Law ("NYHRL"), N.Y.Exec.Law § 296, *et seq.* (Item 1). Plaintiff claims that she was unlawfully terminated based on her disability, Bipolar Affective Disorder (Manic–Depressive Psychosis).

Plaintiff was employed by Buffalo General Hospital or its predecessor, Deaconess Hospital, in the Patient Accounts Department since March 7, 1965. During her employment, she worked under the supervision of several Patient Accounts managers. Plaintiff claims that she had "no problems with any department head in the Patient Accounts Department until Peter Sorci" assumed the position of Director of Patient Accounts in April, 1991 (Item 21). Defendant notes, however, that plaintiff was counseled on several occasions for poor performance or inability to get along with others (Item 18).

## I. Plaintiff's Performance Problems

On June 8, 1967, plaintiff received a "Record of Warning" because she was excessively loud in answering her supervisor (Item 21). On May 25, 1977, plaintiff received a "Record of Warning" for being uncooperative and belligerent with several employees (*Id.*). On January 11, 1979, plaintiff received a "Memo to File" for personal use of hospital supplies and postage at Deaconess Hospital (*Id.*).

After Maureen Weir became plaintiff's supervisor in 1988, plaintiff received a "Record of Warning" for refusal to perform her job duty on November 6, 1989 (*Id.*). On October 4, 1990, plaintiff received a "Record of Warning" for failure to follow job instructions and insubordination after plaintiff had told supervisor Weir to "go chew granola" during discussion of plaintiff's numerous job performance problems (billing errors, etc.) (Item 16, Exh. J). Weir wrote, "[i]f this continues, further disciplinary action up to and including termination will occur." (*Id.*). On October 11, 1990, Weir informed plaintiff in writing that "I as your manager have met with you on several occasions dating back to 10/89 regarding your job performance and attitude." (*Id.*).

In short, prior to Mr. Sorci's becoming department head, plaintiff received several written warnings and two suspensions for arguing with staff and supervisors or for poor job performance (Item 16, Exh. J, K). In addition, since Mr. Sorci became department head in April 1991, plaintiff has received numerous Records of Warning: (1) for disruptive behavior on February 24, 1993; (2) for poor work performance on March 26, 1993; (3) for poor work performance on May 24, 1993; (4) for disruptive behavior on November 15, 1993; and (5) for disruptive behavior on March 29, 1994 (Item 21).

Due to plaintiff's numerous job performance problems, plaintiff was placed in a lower-grade clerical position in the Patient Accounts Department on June 24, 1994, and her hourly wage was reduced from approximately $12.05 per hour to $9.62 per hour (Item 21).

## II. Plaintiff's Disability

In 1985, plaintiff was hospitalized due to a psychiatric condition on two occasions, once for a period of approximately two weeks and the other for a period of about three days (Item 21). Shortly after these hospitalizations, she was diagnosed as suffering from Bipolar Affective Disorder (Manic–Depressive Psychosis) (*Id.*). Plaintiff maintains in her memorandum of law (Item 21) that Maureen Weir was a co-worker of plaintiff's in 1985 and that Weir was aware of these hospitalizations when she became plaintiff's supervisor in 1988 (*Id.*).

However, when plaintiff was asked at her deposition, "Did you ever have any discussion with Ms. Weir regarding your condition?", she answered "Never." (Item 16, Exh. A, at 75). Then she was asked, "Do you know if she [Weir] was aware of it?", plaintiff answered "No." (*Id.*). Plaintiff then stated that Weir was aware of her condition because Weir "would remind me constantly; remember what happened to you before" and plaintiff stated that this referred to her stay in Community Mental Hospital in 1985 (*Id.*). In contrast, Weir stated at her deposition that the earliest that she learned of plaintiff's Bipolar Affective Disorder was just days before her deposition when she met with defendant's counsel (Item 16, Exh. B, at 81).

Based on plaintiff's deposition, defendant maintains that the earliest that defendant hospital knew about plaintiff's disability was sometime in 1993, when plaintiff allegedly told Ellie Foster, the Hospital's Assistant Director of Human Resources (Item 18). In April 1994, plaintiff states that she placed a note from her psychiatrist, Dr. Kim, on Mr. Sorci's desk on April 5, 1994, and a copy was received by Ms. Foster on April 8, 1994 (Item 16, Exh. A, at 75). The note read:

> The above named patient [Alexandria Glowacki] is currently under my care and has been treated for Bipolar Affective Disorder.
>
> Although her condition has been stable, she has been going through alot [sic] of stress stemming from her disturbed son's condition.
>
> The agitation she exhibited at work is a result of her psychiatric condition.

(Item 16, Exh. J). Notably, Mr. Sorci does not recall ever receiving this note from Dr. Kim (Item 16, Exh. C, at 127); Mr. Sorci states that he did not learn of plaintiff's condition until he met with defendant's counsel just weeks before his deposition (*Id.* at 65); plaintiff admits that she never talked with Mr. Sorci regarding her condition (Item 16, Exh. A, at 75); and Ms. Foster never told Mr. Sorci that plaintiff was diagnosed with Bipolar Affective Disorder (Item 16, Exh. D, at 89).

Furthermore, defendant maintains that plaintiff testified at her deposition that she did not need any accommodation to perform her job in a reasonable manner (Item 16, Exh. A, at 83–84). Even after her note from Dr. Kim on April 5, 1994, plaintiff never claimed that her condition prevented her from performing her job (*Id.* at 235).

## III. Events giving rise to plaintiff's termination

The events giving rise to plaintiff's termination occurred on December 13, 1994. On that morning, plaintiff attended a meeting with representatives from the special education branch of the Buffalo Board of Education regarding her son Joey's future. At that meeting, she was advised for the first time that in the opinion of Joey's counselors, his Attention Deficit Hyperactive Disorder was not going to level out, and therefore he may require psychiatric care for the rest of his life.

As a result of this information, plaintiff became extremely upset. She returned to work, crying, and had a conversation with co-worker Sandra Dunbar. Ms. Dunbar's son had also been diagnosed with Attention Deficit Hyperactive Disorder sometime earlier and had tragically committed suicide. While talking with Ms. Dunbar, who sat back to back with plaintiff at work, plaintiff hit Ms. Dunbar in the back for no reason at all and knocked her over her file drawer (Item 16, Exh. E, at 13). Ms. Dunbar then asked plaintiff "what in the hell did you do that for?" and plaintiff responded "that's what Joey would do to me." (*Id.* at 14). Supposedly, Joey's Attention Deficit Hyperactive Disorder would cause him to hit plaintiff.

Plaintiff admits that "I swatted her" while talking with Ms. Dunbar, but states "I never touched flesh." (Item 16, Exh. A, at 51). Plaintiff states that Ms. Dunbar did not say anything and then went to lunch. After she returned an hour later, she told plaintiff "don't ever touch me again." (Item 16, Exh. E, at 14). Ms. Dunbar did not bring up the situation until the following morning when she went to Mr. Sorci and filled out an incident report.

Ms. Dunbar states that the incident occurred around 2 or 2:30 p.m., that she was leaving work at 3 p.m., and that Mr. Sorci was gone for the day (*Id.* at 13). The next morning Ms. Dunbar woke up with pain in her shoulder and upper back (*Id.* at 14). When she returned to work she told Mr. Sorci what happened and Mr. Sorci sent her to get checked out at employee health (*Id.* at 19). Her shoulder blade was red the next day and then black and blue thereafter (*Id.*).

Mr. Sorci met with plaintiff the next day about the incident. Plaintiff told Mr. Sorci that she "did not hit anybody." Plaintiff notes that there were no witnesses to this incident other than herself and Ms. Dunbar. As a result of the incident with Ms. Dunbar, coupled with plaintiff's prior warnings for alleged disruptive behavior, plaintiff was terminated from her employment effective December 19, 1994.

As plaintiff notes in her memorandum of law, Mr. Sorci consulted with Ms. Foster prior to terminating plaintiff (Item 21). Despite Ms. Foster's extensive role in the termination of plaintiff, she states that she did not tell Mr. Sorci that plaintiff had been diagnosed with Bipolar Affective Disorder (Item 16, Exh. C, at 127, Item 16, Exh. D, at 89). Ms. Foster also did not tell Mr. Sorci that plaintiff had brought in a letter from Dr. Kim documenting her condition in April.

## DISCUSSION

Before the court is defendant's motion for summary judgment (Item 16). Defendant argues that no genuine issue of material fact exists and that defendant had a legitimate and nondiscriminatory reason for plaintiff's termination—namely, that she struck a co-

worker. Furthermore, defendant argues that while plaintiff has Bipolar Affective Disorder, plaintiff is not covered under the ADA because this condition does not "substantially limit" any of her major life activities.

## I. Legal Standards

### A. *Summary Judgment*

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In reviewing a motion for summary judgment, the court is required to view any permissible inferences to be drawn from the underlying facts in the light most favorable to the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The movant seeking summary judgment has the initial burden of identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. Fed. R.Civ.P. 56(c). However, once that burden has been met, the non-moving party "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(e)). Moreover, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### B. *Summary Judgment in ADA Discrimination Cases*

When analyzing the order and allocation of proof in discrimination claims under the ADA, courts apply the three-step burden shifting framework articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 800, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and clarified in *St. Mary's Honor Center v. Hicks,* 509 U.S. 502,

506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). *See Heilweil v. Mount Sinai Hosp.,* 32 F.3d 718, 722 (2d Cir.1994), *cert. denied,* 513 U.S. 1147, 115 S.Ct. 1095, 130 L.Ed.2d 1063 (1995).

The three-step *McDonnell Douglas* framework applicable to plaintiff's ADA discrimination claim is:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (quoting *McDonnell Douglas,* 411 U.S. at 802, 804, 93 S.Ct. 1817).

## II. ADA Discrimination Claim

The ADA provides:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a).

"A plaintiff alleging employment discrimination under the ADA bears the initial burden of establishing a *prima facie* case." *Ryan v. Grae & Rybicki, P.C.,* 135 F.3d 867, 869 (2d Cir.1998) (citing *Wernick v. Federal Reserve Bank of N.Y.,* 91 F.3d 379, 383 (2d Cir.1996)). Specifically, "plaintiff must show that: (1) her employer is subject to the ADA; (2) she suffers from a disability within the meaning of the ADA; (3) she could perform the essential functions of her job with or without reasonable accommodation; and (4) she was fired because of her disability." *Id.*

For purposes of this motion, defendant does not dispute that it is subject to the ADA. Thus, the threshold determination that this court must make is whether plaintiff is disabled within the meaning of the ADA. *Id.*

### A. Is Plaintiff Disabled within the meaning of the ADA?

An individual is considered to have a "disability" under the ADA if he or she has: "(1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment." 42 U.S.C. § 12102(2)(A)–(C); 29 C.F.R. § 1630.2(I). "If an individual meets any one of these three criteria, she is considered an individual with a disability for purposes of ADA coverage." *Glidden v. County of Monroe*, 950 F.Supp. 73, 76 (W.D.N.Y.1997).

### 1. Does Plaintiff have a Physical or Mental Impairment that substantially limits one or more of her Major Life Activities?

■ Bipolar Affective Disorder has been recognized as a disability under the ADA. *See Hartog v. Wasatch Academy*, 129 F.3d 1076, 1081 (10th Cir.1997) (citing EEOC Enforcement Guidance: Psychiatric Disabilities and the Americans with Disabilities Act, 2 EEOC Comp. Man. (BNA), filed after Section 902, at 15 ¶ 1 (Mar. 25, 1997) (hereinafter "EEOC on Psychiatric Disabilities")). However, the court must determine whether plaintiff's Bipolar Affective Disorder is "sufficiently severe" so that it "substantially limits one or more of the major life activities" of the plaintiff, such as "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. 1630.2(g)(2), (h)(2)(I); *see also Kotlowski v. Eastman Kodak Co.*, 922 F.Supp. 790, 797 (W.D.N.Y.1996) (holding that ADA plaintiff may not defeat summary judgment motion by simply invoking diagnosis of mental impairment; must also demonstrate that impairment substantially limited ability to work).

Notably, "[a]n impairment does not significantly restrict major life activities if it results only in mild limitations." EEOC on Psychiatric Disabilities, at ¶ 5. Rather, an impairment substantially limits one of these activities if it restricts "the condition, manner or duration" under which an individual can perform the activity "as compared to ... the average person in the general population." 29 C.F.R. 1630.2(j); EEOC on Psychiatric Disabilities, at ¶ 5; *Aquinas v. Federal Exp. Corp.*, 940 F.Supp. 73, 77 (S.D.N.Y.1996).

Thus, to determine whether plaintiff is substantially limited in a major life activity, a court should consider the following regarding the impairment: (1) its nature and severity; (2) its duration; and (3) its long-term impact. 29 C.F.R. 1630.2(j); *Ryan*, 135 F.3d 867, 869. Furthermore, "[t]he first question is whether an individual is substantially limited in a major life activity other than working (e.g., sleeping, concentrating, caring for oneself)." EEOC on Psychiatric Disabilities, at ¶ 4. "Working should be analyzed only if no other major life activity is substantially limited by an impairment." *Id.*

Here, an analysis of plaintiff's major life activities other than working indicates that plaintiff is not substantially limited. Nowhere in the record does plaintiff claim that any of her major life activities are limited. At most, according to Dr. Kim, plaintiff's condition only "sporadically lessened her ability to think, concentrate and work effectively." (*Id.* at ¶ 10). Given that plaintiff's ability to think and concentrate (a major life activity) is limited only sporadically and not substantially, plaintiff is not substantially limited.

Furthermore, in analyzing whether plaintiff's major life activity of working is substantially limited, plaintiff's impairment must not only limit the performance of a "single, particular job," but rather must limit employment generally. 29 C.F.R. § 1630.2(j)(3)(I); *see also Heilweil*, 32 F.3d at 722; *Kirkendall v. U.P.S., Inc.*, 964 F.Supp. 106, 110 (W.D.N.Y.1997). Here, plaintiff has not demonstrated that her impairment limits her employment generally.

The nature, severity, duration, and long-term impact of plaintiff's impairment weigh against the finding of a substantial limitation. Plaintiff stated in her deposition that her Bipolar Affective Disorder did not limit her work (item 16, Exh. A, at 235). She also stated that "my condition did not cause me to strike Sandra Dunbar." (*Id.* at 84). Furthermore, the April 5, 1994 letter from Dr. Kim (Item 16, Exh. J) and Dr. Kim's affidavit (Item 22, Exh. C) merely establish, at most, that plaintiff "Talks more than other people; Talks louder than other people; and Is more sensitive to stress than other people." (*Id.* at ¶ 7). Overall, plaintiff's condition "sporadically lessened her ability to think, concentrate and work effectively." (*Id.* at ¶ 10). The fact that plaintiff's impairment varies in intensity and is sporadic in nature weighs against a finding of a substantial limitation. Her impairment only results in mild limitations and does not limit her employment generally.

These findings are supported by case law. For example, in *Reeves v. Johnson Controls World Services, Inc.,* 140 F.3d 144 (2d Cir. 1998), the Second Circuit held that while the plaintiff suffered from a mental impairment (Panic Disorder with Agoraphobia), his ADA claim was dismissed because he was unable to establish that this impairment substantially limits a major life activity. In *Adams v. Rochester General Hospital,* 977 F.Supp. 226, 232 (W.D.N.Y.1997), the court found that while depression is a mental impairment recognized by the ADA, the plaintiff was unable "to show that his depression substantially limited his ability to work not only at his existing job, but any job." In *Zirpel v. Toshiba America Information Sys.,* 111 F.3d 80, 81 (8th Cir.1997), the Eighth Circuit affirmed the district court's grant of summary judgment because it reasoned that while plaintiff suffered from a mental impairment (panic disorder), plaintiff "failed to create a triable dispute about whether her disorder substantially limits any of her major life activities." Similar to the cases above, plaintiff admitted that her Bipolar Affective Disorder did not limit her work (Item 16, Exh. A, at 235) and that "my condition did not cause me to strike Sandra Dunbar." (*Id.* at 84). *Id.*

### 2. Does Plaintiff have a Record of such an Impairment?

Plaintiff may be considered disabled if she has a record of a mental impairment "that substantially limits one or more major life activities." 29 C.F.R. § 1630.2(k); *Glidden,* 950 F.Supp. at. 76. Although plaintiff's hospitalization and Dr. Kim's affidavit (Item 22, Exh. C) arguably establish that plaintiff has a mental impairment, plaintiff has not presented any evidence that this mental impairment "substantially limits" one or more of her major life activities for the same reasons that were stated in Part I.A.1 above.

In *Glidden,* plaintiff's hospitalization for five days for a nervous breakdown prior to obtaining employment did not establish on its own that one of plaintiff's major life activities was substantially limited. *Glidden,* 950 F.Supp. at 74–76. Rather, plaintiff needed to demonstrate how the nervous breakdown substantially limited one of plaintiff's major life activities. Similarly, in the case at bar, plaintiff has not demonstrated or claimed that she has a record of an impairment that has limited her employment generally as required by 29 C.F.R. § 1630.2(j)(3)(I).

### 3. Is Plaintiff regarded as having such an Impairment?

When the facts are viewed in a light most favorable to plaintiff, she has failed to show that the hospital regarded or treated her as having an impairment that substantially limits one of her major life activities under this section. Plaintiff told Ms. Foster about her Bipolar Affective Disorder sometime in 1993 and she placed the note about her condition on Peter Sorci's desk about it in April, 1994. She further claims that Maureen Weir knew about her condition because Weir said to her "remember what happened to you before." However, when plaintiff was asked at her deposition, "Did you ever have any discussion with Ms. Weir regarding your condition?", she answered "Never." (Item 16, Exh. A, at 75). When she was asked, "Do you know if she [Weir] was aware of it?", plaintiff answered "No." (*Id.*).

Even if the hospital knew about plaintiff's Bipolar condition in 1993, there is no evi-

dence that the hospital record provides proof to show that her condition substantially limited her work or that the hospital treated her as if it did. *See Reeves,* 140 F.3d at 153 ("there is no basis for concluding that defendants viewed plaintiff as being substantially limited in his ability to work in his then-current position, much less in 'a broad range of jobs' "). Plaintiff is unable to provide any evidence that the hospital considered her Bipolar condition when they transferred her in July 1994 or when they terminated her in December 1994. Rather, depositions of Mr. Sorci and Ms. Foster indicate that they did not discuss plaintiff's Bipolar condition prior to her termination (Item 16, Exh. C, at 65; Item 16, Exh. D, at 89). Furthermore, not one of the three of plaintiff's co-workers who were deposed stated that they considered plaintiff to have a disability and not one ever heard comments from plaintiff's supervisors that she had a disability (Item 16, Exh. G, at 27–28; Item 16, Exh. I, at 38). "Plaintiff's speculation and surmise on this point does not constitute evidence of that fact sufficient to warrant denial of the summary judgment motion." *Glidden,* 950 F.Supp. at 77.

In short, plaintiff was transferred because of her demonstrated lack of dependability in her job and was terminated because she hit a co-worker. Accordingly, plaintiff has failed to show that defendant regarded her as having an impairment which substantially limited her ability to work.

Based on the foregoing analysis, plaintiff is not disabled within the meaning of the ADA because she does not have a mental impairment that substantially limits one or more of her major life activities, she does not have a record of such impairment, and she is not regarded as having such an impairment. Therefore, plaintiff is unable to establish a prima facie case of discrimination, and defendant is entitled to summary judgment as to plaintiff's ADA claim.

### III. NYHRL Claim

In addition to bringing this action under the ADA, plaintiff also makes a claim under the NYHRL, New York's counterpart to the ADA. These claims are based on the same facts and circumstances as plaintiff's ADA claim.

The NYHRL states in relevant part that it shall be an "unlawful discriminatory practice" for an employer, because of the disability of any individual, to "discharge from employment such individual or to discriminate against such individual ... in terms, conditions or privileges of employment." N.Y.Exec.Law § 296(1)(a). The term "disability" is defined as:

(a) a physical, mental or medical impairment ... which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory techniques or (b) a record of such an impairment, or (c) a condition regarded by others as such an impairment....

N.Y.Exec.Law § 292(21).

As explained by the Second Circuit in *Reeves,* the NYHRL defines disability more broadly than does the ADA, and that "unlike the federal statute, the state statute does not require [plaintiff] to identify a major life activity that is substantially limited by his impairment." *Reeves,* 140 F.3d at 154. In *Reeves,* the Second Circuit found that plaintiff had a recognized mental impairment diagnosed by a licensed psychiatrist. *Id.* at 156. Since defendants did not challenge the reliability of this diagnosis, but only argued that it did not substantially limit one of plaintiff's major life activities, the Second Circuit held that plaintiff could establish a prima facie case of discrimination under the NYHRL. *Id.*

Since plaintiff articulated a prima facie case of discrimination under the NYHRL, the Second Circuit analyzed whether defendants met their burden under the *McDonnell Douglas* burden shifting analysis by providing a legitimate, non-discriminatory reason for plaintiff's termination. In *Reeves,* the Second Circuit found that defendants did not meet their burden because there still were questions of fact as to why plaintiff was terminated. For these reasons, the Second

Circuit denied summary judgment on the NYHRL claims in *Reeves*.[1]

In contrast to *Reeves*, the defendant in the case at bar has articulated a legitimate, non-discriminatory reason for plaintiff's termination—i.e., she was terminated because she violated work rules and struck co-worker Sandra Dunbar. Unlike *Reeves*, there are not conflicting stories as to whether or not plaintiff struck her co-worker. In fact, plaintiff admitted in her own deposition that she swatted Sandra Dunbar (Item 16, Exh. A, at 51).

Since defendant has articulated a legitimate, non-discriminatory reason for plaintiff's termination, the third step of the *McDonnell Douglas* framework shifts the burden of production back to the plaintiff. *St. Mary's*, 509 U.S. at 510, 113 S.Ct. 2742. "[T]he Supreme Court tells us that 'a reason cannot be proved to be a "pretext *for discrimination*" unless it is shown *both* that the reason was false, *and* that discrimination was the real reason.'" *Fisher v. Vassar College*, 114 F.3d 1332, 1339 (2d Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998) (quoting *St. Mary's*, 509 U.S. at 515, 113 S.Ct. 2742).

Based on this standard for finding pretext, and viewing the facts in a light most favorable to the plaintiff, plaintiff cannot show that the reason for her termination was false. Plaintiff has merely denied defendant's reason for her termination and has not "present[ed] affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson*, 477 U.S. at 257, 106 S.Ct. 2505. Plaintiff has corroborated defendant's reason for termination by admitting in her own deposition that she swatted Sandra Dunbar (Item 16, Exh. A, at 51). Even though plaintiff maintains that she did not "touch flesh," her admission that she swatted Ms. Dunbar is fatal to her case and validates defendant's reason for termination rather than helping to prove the falsity of it.

Therefore, defendant's motion for summary judgment with regard to plaintiff's NYHRL claim is granted.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is granted. The complaint is dismissed, and judgment shall enter for the defendant.

So ordered.

---

1. The Second Circuit noted in a footnote that "[i]n adjudicating NYHRL claims, New York courts use the familiar burden-shifting framework developed in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Reeves*, 140 F.3d at 156 n.9.