Magdalene NWEKE, Plaintiff,

v.

THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, United Food and Commercial Workers International Union, AFL–CIO & CLC and Local 888 Unitedfood and Commercial Workers Union, AFL–CIO, Defendants.

No. 96 CIV. 9279(RWS).

United States District Court, S.D. New York.

Oct. 29, 1998.

Vincent I. Eke–Nweke, Brooklyn, NY, for Plaintiff.

Vladeck, Waldman, Elias & Engelhard, P.C., New York, by Patricia McConnell, of counsel, United Food and Commercial Workers International Union, Washington, DC, By Renee L. Bowser, Assistant General Counsel, for UFCW International Union and UFCW Local 888.

## OPINION

SWEET, District Judge.

Defendants Union Food and Commercial Workers International Union (the "International") and United Foods and Commercial Workers Union Local 888 ("Local 888") (collectively, the "Unions") have moved for dismissal of plaintiff Magdalene Nweke's ("Nweke") complaint as to the claims against them pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction, pursuant to Rule 12(b)(6) for failure to state a cause of action, and for summary judgment pursuant to Rule 56. Specifically, (1) the Unions have moved to

dismiss for lack of subject matter jurisdiction certain allegations of violation of Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12101 *et seq.*, that were not included in the charges Nweke filed with the Equal Employment Opportunity Commission (the "EEOC"), as well as the pendent state law claims; (2) they have moved to dismiss pursuant to 12(b)(6) certain allegations barred by the statute of limitations and the conspiracy claim for failure to be pleaded with particularity; and (3) the Unions have moved for summary judgment with respect to the discrimination claims under Title VII, 42 U.S.C. § 1981, and the ADA claims, as well as the claims alleging that the Unions breached their duty of fair representation owed to Nweke.

For the reasons set forth below, the Unions' individual motions are granted in part and denied in part. Ultimately, however, the Unions' motion for summary judgment is granted and the complaint is dismissed.

### Parties

Nweke, an individual residing in New York, New York, was previously employed by The Prudential Insurance Company of America ("Prudential"), a Delaware corporation authorized to do business in the State of New York.

The International is a labor organization representing employees in an industry affecting commerce. It maintains its principal offices in Washington, D.C.

Local 888 is a labor organization representing employees in an industry affecting commerce and maintains its principal offices in Mount Vernon, New York. It was at all relevant times to this action the International's collective bargaining agent or representative with respect to the International's collective bargaining units located in the State of New York. Local 888 was at all relevant times affiliated with, controlled, and managed by the International. The International and Local 888 were at all relevant times the recognized exclusive collective bargaining representatives of the bargaining unit consisting of all district agents employed by Prudential within the State of New York.

### Prior Proceedings

Nweke filed her complaint against Prudential and the Unions on December 10, 1996 (the "Complaint"), alleging race, sex, and disability discrimination pursuant to Title VII, 42 U.S.C. § 1981, the ADA, the New York State Human Rights Law (the "NYHRL"), Executive Law § 296 *et seq.*, and the New York City Civil Rights Law (the "NYCCRL"). A stipulation and order of dismissal as to Prudential was entered into on January 21, 1998. The Unions filed the instant motion on March 16, 1998, and it was deemed fully submitted, without oral argument, on July 29, 1998.

### Facts

Nweke is a black female who was employed by Prudential as an insurance agent from March 1989 through March 24, 1995, when she was discharged. Nweke worked at the Sheepshead Bay district throughout her employment with Prudential. During Nweke's employment, the International was her exclusive collective bargaining representative and a party to successive collective bargaining agreements ("CBA") with Prudential. The CBAs governed many of the terms and conditions of employment of the insurance agents. Nweke was a member of Local 888, an affiliated local union of the International which represents employees in New York. Local 888 administered the CBA at the local level for the International.

The constitution of the International, which also governs Local 888, the bylaws of Local 888, and the CBAs require the Unions not to discriminate against its members on the grounds of disability, sex, and race.

In May 1993, Nweke notified her sales manager, John Zaia ("Zaia"), and the district manager, Raymond Martinez ("Martinez"), that she was pregnant. On July 23, 1993, Nweke was placed on short-term disability leave ("STD") or maternity leave from work. According to Nweke, prior to the time she notified Zaia and Martinez that she was pregnant, she had a cordial relationship with them. Nonetheless, asserts Nweke, Zaia and Martinez became hostile toward her upon

learning of her pregnancy by avoiding her and ridiculing her for being pregnant.

Prudential's disability unit required Nweke to work in January 1994 because additional benefits had not been approved to enable her to continue her leave. Nweke returned to work for three days on January 21 through January 24, 1994, and then resumed her disability leave. Nweke contends that she went back on disability leave because she was unable to concentrate, think clearly, make telephone calls, read, or talk to anyone in the office. She states that Prudential treated her absence as an unauthorized leave of absence and punished her by generating payroll checks with negative balances for her, instead of checks for disability benefits, and refused to release her wage and income statement.

In May 1993, prior to taking her initial leave of absence, Nweke began seeing a psychiatrist. She did not disclose to Prudential or the Unions that she was seeing a doctor. On July 26, 1993, shortly after her leave began, Nweke wrote a letter to Zaia that her pregnancy was neither a mental illness nor a state of ill health. In the same letter, Nweke wrote that she was not incapable of functioning due to her health. In a letter to Zaia dated July 31, 1993, Nweke stated, "this is just maternity leave." While on leave, Nweke gave birth to a child on October 1, 1993.

Following the delivery of her baby, Nweke was diagnosed with acute bilateral arthralgia of both hands and wrists by Dr. V.A. Paignajen. During the same period, she was also diagnosed with neurotic depression and postpartum depression by Dr. Ewa, a psychiatrist who treated her with individual psychotherapy. Additionally, Nweke was treated by Dr. Lawrence C. Miller, a psychiatrist, who diagnosed her with major depression on December 24, 1994, and placed her on Prozac.

Nweke's leave ended March 1, 1994, and following her doctors' recommendations, she returned to work March 2, 1994. In a March 3, 1994 letter to Martinez, Nweke principally complained about her failure to get proper disability compensation and returned four checks which she stated were for incorrect amounts. She also wrote that she was not at liberty to discuss her medical condition because of her privacy concerns. According to Nweke, on her return to work, her job condition changed for the worse. She was forced to work under Madelyn Harte ("Harte"). Nweke describes Harte as an inexperienced agent who was promoted over Nweke from the position of an agent to sales manager in the same week that Nweke returned to work. When Nweke questioned why Harte was promoted before she was and why she had to work under Harte, Martinez stated that Harte would not leave him to go and have a child since Harte had passed the child-bearing age. Nweke submits that Martinez stated to her that she chose a baby over her career.

According to Nweke, she telephoned John Provenzano ("Provenzano"), then Director of Insurance for Local 888, in December 1993, January and March 1994, and left messages regarding the problems she was having at Prudential, but that Provenzano did not return her calls. Three weeks following her return to work, by letter dated March 23, 1994, Nweke wrote to Provenzano, stating that "I had a baby. The pregnancy was difficult and I was sick. After the baby, she was sick and I was sick." She enclosed with the March 23 letter "copies of my doctors statements for the period of absence in question." A January 31, 1994, doctor's statement signed by Dr. Ewa recommended that Nweke return to work on short hours. A February 15, 1994, doctor's statement signed by Dr. Miller released Nweke to return to full-time duty effective March 2, 1994. Nweke complained in the letter that her working conditions were intolerable because of increased oversight by Harte and because she had not received any paychecks as of that time, Nweke did not provide Provenzano or any other representative of the Unions with medical documentation of her condition following her return to work. Nweke admits that from April 1994 to the end of the year, she did not have any doctors' statements or other records in her possession indicating that she was continuing to see a psychiatrist during that period. Nweke asserts that following the sending of the return to work

certificates on March 23, 1994, she did not provide the Union representative with any doctors' statements about her condition in 1994. Nor did Nweke provide any medical statements about her condition in 1995. Nweke stated that she does not recall whether she was mentally disabled or still seeing a psychiatrist and that it is possible that she never told Provenzano.

During a telephone conversation Nweke had had with Provenzano prior to sending the letter of March 23, Nweke informed him that she had not been paid her disability benefits for the period January 25, 1994, through March 2, 1994; that she was not paid readjustment salary for a period of six weeks from March 2, 1994; that her agency was vandalized while she was on maternity leave; and that some policies and commission credits existing therein were given to other agents.

As to these assertions, during the time that Nweke was on STD, Prudential's policy regarding disability leave was that when an agent is on STD the agent's agency is "frozen." The sales manager of the agent becomes responsible for the day-to-day management or control of the agency. When Nweke was on STD, Zaia was responsible for the day-to-day management of her agency, including but not limited to the servicing and conservation of all the business in the agency. Also, in accordance with the CBA, Prudential is required to preserve the agency intact for the agent and to reinstate the agent to that agency upon his or her return to work. At Prudential, an insurance policy is considered lapsed if premium for the policy is not received by Prudential after thirty-one days from the date such premium is due. Pursuant to the CBA, an agent who produced or wrote an insurance policy continues to retain his or her commission interest in the policy if the policy lapses in the first policy year and an application for reinstatement of the policy is made within three months from the date premiums were last paid on the policy. The CBA provides that if Prudential does not receive premiums for the first four months of an insurance policy, all annualized commission previously credited to the producing agent are charged back or withdrawn.

According to Nweke, less than ten weeks after she went on STD, more than fifteen policies in her agency were transferred or reinstated to other Prudential agents for servicing. Those agents were also credited with the commissions from the policies. Also, within the same period, claims Nweke, Prudential charged back or withdrew all annualized commission previously credited to Nweke for those policies that were transferred or reinstated to other agents.

Regarding the conversation with Provenzano, Nweke asserts that she informed him that she was sick from depression and acute bilateral arthralgia on both wrists and was undergoing continuing psychotherapy and taking Prozac for depression, and that one of her doctors had recommended working short hours and that she requested an accommodation for his disability by performing only fifty percent of her usual agency duties. Nweke also told Provenzano that Martinez was putting pressure on her and harassing her, destabilizing and punishing her for having a baby by making her work under the constant supervision of a junior agent, by asking if she has made arrangement for babysitting, by telling her that she chose to have a baby in preference to her career, and by asking her not to make a deposit unless it is countersigned by Harte. Nweke describes the hostile environment in 1994 upon her return to work as having to go to meetings to get assistance and approval for applications even though she was a veteran agent with more experience than Harte who replaced Zaia as her sales manager.

Nweke represents that she also told Provenzano that three magazines with black women on the covers were placed on her desk. Nweke did not see who put the magazines on her desk. She claims that other than the magazines, she has no basis for her allegations of race discrimination. Nweke asserts that she did not tell Provenzano or any other Union representative any other information that would put the Unions on notice that Prudential was trying to terminate her on the basis of her race.

Nweke did not tell Provenzano that she was unable to do her job when she returned to work in March 1994, and she did not request that she be placed on short hours and be given any other accommodation concerning her work.

During that telephone conversation, Nweke contends that Provenzano told her that the CBA between the International and Prudential covers specific matters which do not include discrimination; that he will help Nweke file a grievance regarding her disability benefits, readjustment salary, and the policies and commission credits that were taken from her agency. There is dispute as to whether Nweke indeed informed Provenzano of the comments Martinez made regarding Nweke's pregnancy or choice to have a baby. Nweke urges that her complaints of sex and disability discrimination and harassment by Martinez were not included in her 1994 grievance because the Unions did not want to confront or antagonize management and because Provenzano told her that the CBA covers labor matters and not issues of discrimination.

On March 21, 1994, Nweke received a letter from Prudential Vice President, Regional Marketing, Gary Russo ("Russo"), placing her on low production probation ("LPP") as a result of her 1993 first year commission credits production. Agents having the lowest 20% production in their district are eligible for placement on LPP. While on probation, the agents have to meet the prior year's average production each quarter of the probation year in order to remain employed. The letter notified Nweke that she was on a one-year probation beginning the week of April 4, 1994. For each quarter of the probation, Nweke would have to equal or exceed 25% of Sheepshead Bay's district average of first year commission credits in order to proceed to the next quarter of probation. By letter dated March 29, 1994, Nweke wrote Russo that his letter placing her on LPP was an error and that LPP did not apply to her. The reason she gave for the inapplicability of LPP was her disability leave of absence. Nweke was aware of Prudential's LPP policy dated January 1992 and saw part of the manual on the bulletin board. Nweke did not advise Provenzano that the LPP policy had an adverse impact on women or that she was discriminatorily placed on LPP.

In a March 24, 1994 letter to Martinez, Nweke complained that her checks were being withheld, that during her absence the policies in her agency were vandalized and cases reinstated to other agents, and that she was experiencing unwanted oversight by her new sales manager.

By letter dated March 24, 1994, Nweke notified Provenzano that she was in the process of filing a grievance with the assistance of the office shop steward. Under the procedure for filing a grievance, a grievant prepares the grievance with the assistance of the shop steward, called a district office chairman, for submission to the grievant's district manager. The district office chairman is also an insurance agent. The grievance served on Prudential on May 3, 1994 ("1994 grievance") alleges the denial of final disability leave payments, failure to receive pay since returning to work on March 2, 1994, transferral of her policies to other agents while she was on disability, and failure to receive commissions which she alleges should have been credited to her. The 1994 grievance also referred to readjustment pay, which can mean any payment for compensation that an individual should have received for one reason or another but did not receive. An agent on disability leave receives disability benefit payments and does not receive any supplemental payments. The commissions the agent earns from policies during disability leave are credited and stored for the agent in a product commission account until the agent returns from disability leave, at which time the agent begins to receive income from the account. Nweke did not mention any other concerns in her 1994 grievance.

Prudential requested and Local 888 agreed to an extension of time for responding to the 1994 grievance. Shortly after the grievance was filed, Nweke received her final disability payments. Provenzano, who has no authority to examine Prudential records, contacted Prudential manager Donald Carter about Nweke's disability leave checks and Dana Lombardi about Nweke's allegation that her policies had been purposely lapsed while she

was on leave. Provenzano received Prudential's response to the 1994 grievance by letter dated October 7, 1994, and notified Nweke of the answer. Provenzano believed, based on the October 7 response, that Prudential had attempted to resolve the issues in Nweke's grievance. Prudential stated that policies and their related commission credits that were reinstated to other agents were to be returned to Nweke's credit, and Nweke was made aware of this request. In a letter dated September 2, 1994, to Martinez, Nweke acknowledges Prudential's agreement to return policies and commission credits to her. The October 7 letter stated that Nweke had received compensation for all other relevant periods. Nweke informed Provenzano that certain polices were returned to her and that she had received credit for them. She also states that a certain insurance policy was not reinstated to her and that if it had been she would have satisfied the LPP quota in the last quarter of 1994.

According to Nweke, the 1994 grievance was never resolved or referred to arbitration. She states that Provenzano was hostile and antagonistic towards her, that he called her "mental" once, and that he hung-up the phone on her many times and requested her to consult a physician if she was sick.

Nweke received a letter dated July 29, 1994, from Russo indicating that she met the requirements of the first three months of her probation and that it was being continued into the second quarter. Nweke acknowledges that she was successful at her job at that time. She states that as of July 29, 1994, she had not told Provenzano that she was unable to satisfy the LPP requirements. She did not even mention LPP requirements to Provenzano. Nweke also received a letter dated October 31, 1994, from Russo indicating that she met the requirements of the second quarter of her probation and that the probation was being continued into the third quarter. Nweke contends that at the time she "did not work extraordinary hard," but rather was "just working normally." Again, she admits that she made no mention to Provenzano regarding LPP or her ability to satisfy the required quota. In a September 2, 1994 letter, Nweke wrote to Martinez that she was being productive and improving herself by taking courses. She also said that she was promoting Prudential by performing community volunteer services. She listed two organizations and her church as volunteer activities.

Nweke received a termination letter from Prudential, dated March 13, 1995, on March 24, 1995, stating that she had failed to meet the requirements for the third quarter of her probation. Nweke contacted Provenzano by telephone the day she received the letter. That same day, Provenzano sent Nweke a grievance form with a short written grievance alleging unjust termination. He told her that the grievance had to be filed with the district manager within fourteen days. In a letter dated March 27, 1995, Nweke acknowledged receiving the grievance form within three days after it was mailed. She also concluded that Local 888 had failed to help her with her 1994 grievance. Provenzano contacted district office chairman Goren Ljuljic ("Ljuljic") to stress the fourteen-day deadline for filing the grievance. Ljuljic told Provenzano that Nweke missed appointments for having him sign the grievance and getting it filed with Prudential. Nweke did not sign an authorization to file the grievance until April 20, 1995. She stated that the termination grievance should be amended to conform with the grievance stated in a letter she wrote to Provenzano dated April 19, 1995.

By letter dated May 9, 1995, Provenzano wrote Nweke that he had not yet received her completed grievance which first had to be presented to the district manager and then forwarded to him. On May 4, 1995, he wrote to Thomas A. Campbell ("Campbell") of Prudential regarding Nweke's termination even though he did not have a copy of the grievance. By letter dated June 13, 1995, Prudential responded that Nweke had not filed her grievance in the Sheepshead Bay district as required. On July 10, 1995, Provenzano wrote to Prudential explaining the problems with the filing of Nweke's discharge grievance.

On July 31, 1995, Prudential agreed with the International to waive the contractual time limit on Nweke's discharge grievance in order to allow for its processing. The Inter-

national processed Nweke's discharge grievance to the President's Committee held on November 20, 1995. Campbell, who represented Prudential at the President's Committee, discussed Nweke's 1994 grievance with the Union as part of the background discussion for the termination grievance. Prudential reviewed Nweke's net first year commission credit figures for 1993 following the discussion with the International at the President's Committee meeting.

Following the meeting, Prudential sustained its discharge decision. On December 4, 1995, the International sent Prudential a form letter stating that it wanted to refer Nweke's grievance to arbitration in order to provide time for making a final decision regarding arbitration. On May 6, 1996, the International wrote Nweke that it did not have sufficient evidence to process her discharge claim any further.

On June 21, 1995, Nweke filed an EEOC charge against Prudential, alleging race, sex, and disability discrimination. She filed an EEOC charge against Local 888 on June 23, 1995, alleging race, sex, and disability discrimination as well ("1995 EEOC charge"). Nweke's 1995 EEOC charge against Local 888 alleged that she was discriminatorily discharged, that the union said it did not receive her termination grievance, and that she was denied union representation regarding her termination grievance. Nweke also filed an unfair labor practice charge against Local 888 with the National Labor Relations Board on June 16, 1995.

On June 15, 1996, Nweke filed a discrimination charge against Local 888 with the EEOC, alleging retaliation for having filed the 1995 EEOC charge against the union ("1996 EEOC charge"). The 1996 EEOC charge alleged that she had filed a grievance in 1994, the union and Prudential agreed to discuss her 1995 termination grievance, that she filed charges against Local 888 in June 1995, and that in retaliation for the 1995 charges, the Unions and Prudential failed to discuss her grievance as required by the CBA. On the same day she filed an identical retaliation EEOC charge against Prudential. On September 12, 1996, the EEOC issued dismissals and notices of right to sue with regard to Nweke's two discrimination charges against Local 888. The EEOC charges against Prudential were also dismissed.

### Discussion

#### I. Legal Standards

##### A. Rule 12(b)(6)

On a Rule 12(b)(6) motion to dismiss, the factual allegations of the complaint are presumed to be true and all factual inferences must be drawn in the plaintiff's favor and against the defendants. See Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); Mills v. Polar Molecular Corp., 12 F.3d 1170, 1174 (2d Cir.1993); Cosmas v. Hassett, 886 F.2d 8, 11 (2d Cir.1989); Dwyer v. Regan, 777 F.2d 825, 828–29 (2d Cir.1985). Accordingly, the factual allegations of the Complaint are presumed to be true for the purpose of deciding the motions to dismiss.

Rule 12(b)(6) imposes a substantial burden of proof on the moving party. A court may not dismiss a complaint unless the movant demonstrates "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." H.J., Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 249–50, 109 S.Ct. 2893, 106 L.Ed.2d 195, (1989); Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59, (1984); Conley v. Gibson, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80, (1957).

##### B. Rule 56

Rule 56(c) of the Federal Rules of Civil Procedure provides that a motion for summary judgment may be granted when "there is no genuine issue of material fact remaining for trial and the moving party is entitled to judgment as a matter of law." The Second Circuit has repeatedly noted that "as a general rule, all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party." Tomka v. Seiler, 66 F.3d 1295, 1304 (2d Cir.1995); Burrell v. City Univ. of N.Y., 894 F.Supp. 750, 757

(S.D.N.Y.1995) (citing *Brady v. Town of Colchester*, 863 F.2d 205, 210 (2d Cir.1988) and *Celotex Corp. v.. Catrett*, 477 U.S. 317, 330 n. 2, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (Brennan, J., dissenting)). If, when viewing the evidence produced in the light most favorable to the nonmovant, there is no genuine issue of material fact, then the entry of summary judgment is appropriate. *Burrell*, 894 F.Supp. at 758 (citing *Binder v. Long Island Lighting Co.*, 933 F.2d 187, 191 (2d Cir.1991)).

In addition to the foregoing standards, the Second Circuit has held that additional considerations must be taken into account when deciding whether summary judgment should issue in an employment discrimination action. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir.1994); *see also Montana v. First Fed. Sav. & Loan Ass'n*, 869 F.2d 100, 103 (2d Cir.1989); *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.1985). Because writings directly supporting a claim of intentional discrimination are rarely, if ever, found among an employer's documents, a trial court must be particularly cautious about granting summary judgment when the employer's intent is at issue. Affidavits and depositions must be scrutinized for circumstantial evidence which, if believed, would show discrimination. *Gallo*, 22 F.3d at 1224. Nonetheless, when the defendant provides convincing evidence to explain its conduct and the plaintiff's contention consists of purely conclusory allegations of discrimination, the Court may conclude that no material issue of fact exists and it may grant summary judgment in favor of the defendant. *See Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 312–14 (2d Cir.1997); *Meloff v. New York Life Ins. Co.*, 51 F.3d 372, 375 (2d Cir.1995). "In other words, to defeat summary judgment, 'the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination.'" *Morris v. Amalgamated Lithographers of Am., Local One*, 994 F.Supp. 161, 168 (S.D.N.Y.1998) (quoting *Stern*, 131 F.3d at 312).

## II. Subject Matter Jurisdiction Is Lacking Over Certain Allegations in the Complaint That Were Not Raised in the EEOC Charges Against Local 888

The Unions assert that pursuant to Rule 12(b)(1), the court lacks jurisdiction over the subject matter of certain allegations of Title VII and ADA violations that were not included in the charges Nweke filed with the EEOC, including allegations that the LPP policy is an intentionally discriminatory policy, that the LPP policy discriminated against female employees as a class, that the LPP policy has a disparate impact on female and disabled employees, that Nweke requested an accommodation, and that the Unions failed to negotiate or discriminatorily negotiated the functions of the insurance agent job in violation of the ADA.

Filing a charge with the EEOC is a jurisdictional prerequisite to a private civil action under Title VII. *See* 42 U.S.C. § 2000e–5(e); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 798, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). A district court only has jurisdiction to hear claims which are either raised in the EEOC charge or are "reasonably related" to the EEOC charges. *See Butts v. City of New York Dep't of Hous.*, 990 F.2d 1397, 1402 (2d Cir.1993). The ADA has substantially the same subject matter jurisdiction requirements as Title VII. *See Chatoff v. West Publishing Co.*, 948 F.Supp. 176, 178–79 (E.D.N.Y.1996). The Second Circuit has recognized three different situations where claims not alleged in an EEOC charge are sufficiently related to provide jurisdiction: (1) where the claim brought in the civil action concerns conduct which would fall within the reasonable scope of the EEOC investigation; (2) where the claim alleges retaliation for filing the EEOC charge; and (3) where the plaintiff alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge. *See Butts*, 990 F.2d at 1402–03. Vague allegations in an EEOC charge cannot serve as predicates for allegations in the complaint. *See id.* at 1403.

This jurisdictional prerequisite requires dismissal of various allegations in the

Complaint. First, Nweke did not allege in her EEOC charge against Local 888 that the LPP policy is an intentionally discriminatory policy based on race, sex, or disability. Although the focus is directed at the allegations against the Unions set forth in the EEOC charge against Local 888, the 1995 EEOC charge against Prudential also does not make this allegation. Accordingly, any allegation in Nweke's Complaint that Prudential follows a policy or practice that discriminates for which the Unions may be liable is dismissed against the Unions. Similarly, Nweke's Complaint allegations that the LPP policy has a disparate impact on female and disabled persons and that production quotas discriminate against females were not contained in nor are reasonably related to her discrimination charges filed against Local 888.

In her 1995 EEOC charge against Local 888, Nweke simply alleged that she was discriminatorily discharged by Prudential and denied union representation because her grievance was not processed properly. Specifically, she states that Local 888 failed to take any action regarding the grievance filed with respect to her termination and that if she had been a white male without a disability, she would have been afforded union representation. In her 1996 charge, she alleged that Local 888 refused to take her grievance to arbitration because she filed the 1995 charge against it.

This Court, in *Gilliard v. New York Public Library System*, 597 F.Supp. 1069, 1078–79 (S.D.N.Y.1984), faced with an EEOC claim that stated, "I am non-white and have been denied equal terms, conditions and privileges of employment and demoted on or about July 1, 1981," dismissed complaint allegations of "a longterm pattern and practice of racial discrimination" against black employees of the defendant. It was found that:

> Even if [the plaintiff] is given the benefit of a broad reading of the EEOC complaint, the allegations as to a general pattern of discrimination by the [defendant] fall outside of the scope of the charge. [The plaintiff's] EEOC charge was limited to a claim of discriminatory discharge. Because the EEOC charge did not give the [defendant] sufficient notice of [the plaintiff's] intention to raise these allegations pertaining to discrimination in wages, benefits and training, [his] Title VII claim as to these allegations must be dismissed.

*Id.* at 1079.

For the same reasons, Nweke's claims concerning the LPP policy—that the production quotas have a disparate impact on females and the disabled or that they adversely affect female agents returning from maternity leave—are not reasonably related to the charge against Local 888 that it would not process her termination grievance or that it retaliated against her for filing the original charge against it. It therefore must be dismissed.

According to the Unions, the disability allegations likewise fail because Nweke did not allege in here EEOC charge that she requested or was refused an accommodation for her disability. The Unions submit that the EEOC September 12, 1996 dismissal of both EEOC charges against Local 888 did not address any accommodation theory of discrimination and that the fact that the EEOC did not investigate the issue of accommodation prevents the court from hearing Nweke's accommodation claim. *See Chatoff*, 948 F.Supp. at 179–80. Nweke, however, counters that her charge against Local 888 specifically incorporated her EEOC charge against Prudential by reference and that the EEOC letter to her forwarding her notice of right to sue on the Prudential charge indicates that the EEOC investigated the issue of accommodation.

It is not clear that the charge against Local 888 did incorporate the Prudential charge. Nonetheless, reading the EEOC charge in a light most favorable to Nweke, the accommodation claim falls within the reasonable scope of investigation of Nweke's contention that her termination was based upon a disability. Thus this claim will not be dismissed for lack of subject matter jurisdiction.

Finally, the Unions represent that Nweke failed to mention in the EEOC charge that Local 888 engaged in discriminatory negotiations or failed to negotiate essential and mar-

ginal functions of the insurance agent's job in violation of the ADA. As this is not reasonably related to Nweke's allegations of unlawful discharge, it also must be dismissed.

### III. Nweke's Claims of Discriminatory Placement on LPP Are Time–Barred Under Title VII and the ADA

▇▇ Both Title VII and the ADA require that claims be based on events that occurred within a limited period prior to the filing of an administrative complaint. *See* 42 U.S.C. § 2000e–5(e)(1); 42 U.S.C. § 12117(a). Generally, Title VII and ADA discrimination claims must be filed with the EEOC within 180 days of the date when the alleged unlawful employment practice occurred. *See* 42 U.S.C. § 2000e–5(e)(1); *Dixit v. City of New York Dep't of Gen. Servs.*, 972 F.Supp. 730, 735 (S.D.N.Y.1997). However, in New York, which has its own antidiscrimination laws and enforcement agency, the limitations period for filing EEOC claims is extended to 300 days. *Id.; see also Ford v. Bernard Fineson Dev. Ctr.*, 81 F.3d 304, 307 (2d Cir.1996); *Settecase v. Port Auth. of N.Y. and N.J.*, 13 F.Supp.2d 530, 533–34 (S.D.N.Y.1998). A claim must be brought within this frame of time otherwise it is time-barred and may not be the basis for relief in federal district court. *See Butts*, 990 F.2d at 1401. This statutory requirement is analogous to a statute of limitations. *See Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 394, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982); *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 712 (2d Cir.1996).

▇▇ In the instant case, Nweke filed a charge of discrimination against the Unions with the EEOC on June 23, 1995, well within 300 days of her termination on March 24, 1995, by Prudential. However, as the Unions point out, Nweke's allegation that she was discriminatorily placed on LPP is time-

barred because the placement occurred on March 21, 1994, prior to August 28, 1994, which by Nweke's calculation is 300 days before the filing date.[1] Accordingly, the Unions urge that the allegations that the Unions discriminatorily failed to represent her regarding her placement on LPP must be dismissed as untimely.

In response, Nweke contends that filing charges with the EEOC tolled the limitation time for her ADA and Title VII claims, and alternatively, that the claims based on acts occurring prior to August 28, 1994, are preserved pursuant to the "continuing violation" doctrine.

▇▇ As to Nweke's first assertion, Nweke relies on *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982), to support her proposition that the filing of a timely charge of discrimination with the EEOC is subject to waiver, estoppel, and equitable tolling. Nweke, however, fails to provide any facts or theories as to why the Unions have waived or are estopped from asserting the defense of statute of limitations.

Indeed, Nweke has not asserted that she was "actively misled by [the Unions], . . . was prevented in some extraordinary way from exercising [her] rights, or . . . asserted [her] rights in the wrong forum, in which event tolling of the time bar might be permitted as a matter of fairness." *Miller v. International Telephone and Telegraph Corp.*, 755 F.2d 20, 24 (2d Cir.1985) (citation omitted). Nor has she "provided . . . evidence of deliberate misconduct or bad faith by [the Unions] sufficient to invoke equitable estoppel." *O'Malley v. GTE Serv. Corp.*, 758 F.2d 818, 822 (2d Cir.1985). Thus the Unions have not waived or are equitably estopped from successfully raising the statute of limitations defense.

---

1. It bears noting that the statute of limitations for claims brought under § 1981 is three years. *See Tadros v. Coleman*, 898 F.2d 10, 12 (2d Cir.1990); *Johnson v. Nyack Hosp.*, 891 F.Supp. 155, 162 (S.D.N.Y.1995), *aff'd*, 86 F.3d 8 (2d Cir.1996); *Gilliard*, 597 F.Supp. at 1076. The claim accrues and the limitations period begins to run when the plaintiff has notice of the act that is claimed to have caused the injury. *See Chardon v. Fernandez*, 454 U.S. 6, 8, 102 S.Ct. 28, 70 L.Ed.2d 6 (1981). Thus the claim for discriminatory placement on LPP is not untimely under § 1981.

Nonetheless, it is dismissed as to the Unions since Nweke has failed to show that the Unions knew about Nweke's complaints of the LPP policy and her placement on LPP, that the policy is racially discriminatory, or that Nweke was placed on LPP because of her race.

Additionally, the existence and utilization of collective bargaining procedures to remedy an alleged wrongful discharge by an employer does not toll the running of the statutory period for filing a charge with the EEOC. *See International Union of Elec. Workers v. Robbins & Myers, Inc.*, 429 U.S. 229, 240, 97 S.Ct. 441, 50 L.Ed.2d 427 (1976); *see also LaBeach v. Nestle Co.*, 658 F.Supp. 676, 686 (S.D.N.Y.1987).

As to Nweke's alternate contention, the continuing violation doctrine fails to save the allegation of discriminatory placement on LPP.

> Under the continuing violation exception to the Title VII limitations period, if a Title VII plaintiff files an EEOC charge that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims of acts of discrimination under that policy will be timely even if they would be untimely standing alone.

*Lambert v. Genesee Hosp.*, 10 F.3d 46, 53 (2d Cir.1993) (citations omitted). This doctrine is most commonly applied "when there is evidence of an ongoing discriminatory policy or practice, such as use of discriminatory seniority lists or employment tests." *Van Zant*, 80 F.3d at 713. Additionally, a continuing violation may be found "where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice." *Id.* (quoting *Cornwell v. Robinson*, 23 F.3d 694, 704 (2d Cir.1994). However, "discrete acts of discrimination that are not shown to be the product of a policy or practice do not constitute a continuing violation." *Dixit*, 972 F.Supp. at 735; *see Van Zant*, 80 F.3d at 713; *Cornwell*, 23 F.3d at 704.

The Court in *Johnson v. Nyack Hosp.*, 891 F.Supp. 155 (S.D.N.Y.1995), *aff'd*, 86 F.3d 8 (2d Cir.1996), identified three factors for consideration in determining whether alleged discriminatory acts are discrete, independent events or elements in a continuing violation. These factors are: (1) whether the alleged acts involve the same type of discrimination, (2) whether they recur frequently or are more in the nature of isolated employment decisions, and (3) whether they exhibited a degree of permanence that should trigger the employee's duty to assert his rights. *See id.* at 163. Moreover, the continuing violation theory is available only if circumstances are such that a reasonable person in the plaintiff's position would not have sued earlier. *See Morris*, 994 F.Supp. at 164; *see also Nicholas v. Nynex, Inc.*, 974 F.Supp. 261, 269 (S.D.N.Y.1997) (finding that alleged interrelatedness of denial of fair evaluations, promotions, and awards did not produce an ongoing violation so as to extend the statute of limitations).

As the Unions contend, Nweke's allegation of discriminatory placement on LPP does not qualify as a continuing violation because it was a completed, discrete act about which Nweke knew or had reason to know had accrued immediately after her placement. She therefore had a duty to assert her rights at that time. *See Dixit*, 972 F.Supp. at 736 (holding that there was no continuing violation because once plaintiff was denied a promotion on allegedly explicit racial grounds, he could reasonably have been expected to sue at that time). Nweke's placement on LPP was an "isolated" act and not part of a "dogged pattern" of discrimination. *Sunshine v.. Long Island Univ.*, 862 F.Supp. 26, 29 (E.D.N.Y.1994).

By contrast, Nweke urges that she was terminated pursuant to the LPP policy which had been in effect for nearly ten years prior to her discharge and that the LPP policy itself has a discriminatory effect against child-bearing females and persons with disability. Nweke continues that the Complaint alleges this discriminatory effect and that Prudential has a policy and practice of discriminating against women and persons with disability. Finally, she notes that the act of placing her on probation in April 1994 and the termination of her employment in March 1995 resulted from a discriminatory policy or mechanism sufficient to establish a continuing violation.

Granted, Nweke's placement on LPP had a continuing impact in that she had to satisfy the LPP production requirements. However, the violation was the allegedly discriminatory placement which Nweke believed was

discriminatory at the time of its occurrence. *See generally Samuel v. Merrill Lynch Pierce Fenner & Smith,* 771 F.Supp. 47, 49 & n. 1 (S.D.N.Y.1991). Nweke's theory is essentially predicated on the fact that the LPP itself is discriminatory. As discussed above, this claim is dismissed due to lack of subject matter jurisdiction. Nweke's proposition that she was discriminatorily placed on LPP is separate and distinct from a claim that the LPP policy itself discriminated against women and those with disabilities. Moreover, Nweke claims no other incidents where individuals who are women or disabled were discriminatorily put on LPP so as to create an inference that the practice amounts to a discriminatory policy. *See Lightfoot v. Union Carbide Corp.,* 110 F.3d 898, 907 (2d Cir.1997) (citing *Van Zant,* 80 F.3d at 713).

The Unions submit that Nweke was terminated not because of any discriminatory practice, but because she failed to satisfy the requirements of her probation. Nweke has provided no evidence to indicate that Prudential knew that if it discriminated against her by placing her on probation because she was a woman with an alleged disability that she would not meet the quota required so as to provide it a reason to terminate her. The link between the discriminatory placement on LPP and the allegations that the LPP policy has a discriminatory effect has not been established. Because the placement does not constitute a continuing violation, it is barred as untimely.

■ Clarification is required as to Nweke's allegation that the Unions' handling of her 1994 grievance was improper. While the discriminatory placement claim is time-barred, the Unions' handling of the grievance Nweke filed in 1994 will not be dismissed on statute of limitations grounds. These are two separate issues. Indeed, the 1994 grievance makes no mention of the LPP policy or Nweke's placement on probation.

The record reflects that Nweke's despair in the handling of the 1994 grievance was voiced in a March 27, 1995 letter she wrote to Provenzano, in which she stated, "It is with deepest regret that I have come to the conclusion that the Union has failed to help me." This is well within the limitations period.

Assuming *arguendo* that Nweke knew or had reason to know that the Unions' alleged breach occurred prior to the limitations deadline, Nweke's mishandling claim is not isolated, but rather resembles the claim concerning the handling by the Unions of the 1995 grievance. Nweke alleges a pattern of how the Unions handled her grievances that were predicated upon discrimination carried out by Prudential. The handling of the 1994 grievance is another incident of alleged discrimination carried out in the same manner alleged in the EEOC charge regarding the termination grievance. *See Burrell v. City Univ. of N.Y.,* 995 F.Supp. 398, 407 (S.D.N.Y. 1998). It therefore comes within the umbrella of continuing violation, and the Unions will not be spared in confronting the merits of that claim.

### IV. Nweke's Claims Pursuant to Title VII, the ADA, and § 1981 Involving the Unions' Duty of Fair Representation Are Not Time–Barred

The Unions contend that although Nweke claims to have been discriminated against in violation of Title VII, § 1981, and the ADA, her claim is actually one for breach of duty of fair representation. According to the Unions, the Complaint's allegations against Prudential were based on the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 301, because Nweke alleges a breach of the CBA, and the allegations against the Unions all concern breaches of the Unions' duty of fair representation.

Essentially, the Complaint states four broad claims against the Unions: (1) that the Unions discriminated against Nweke on the basis of her disability, sex, and race by failing to investigate or prevent Prudential's discriminatory conduct, as they condoned or ratified such conduct; (2) that the Unions did not fairly represent Nweke because they failed to process her grievances further than the final step before arbitration and failed to make a demand for arbitration; (3) that the Unions retaliated against her for filing a charge against Local 888 with the EEOC by failing to process or discuss her termination grievance properly; and (4) that the Unions breached their duty of fair representation by

conspiring with Prudential to permit Nweke's unlawful termination to stand.

The Unions assert that because a hybrid LMRA § 185/duty of fair representation claim is governed by a six-month statute of limitations, dismissal is warranted on all claims against the Unions. The Unions' contention, however, is unpersuasive. Although the United States Supreme Court has held that the statute of limitations for breach of duty of fair representation claims is six months, *see DelCostello v. International Bhd. of Teamsters*, 462 U.S. 151, 172, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983), examination of Nweke's Complaint reveals that she has alleged claims under Title VII, § 1981, and the ADA, as opposed to a breach of the duty of fair representation under the LMRA. While the LMRA provides employees with a remedy for a breach of duty of fair representation, Nweke has not made a claim pursuant to 29 U.S.C. § 185.

 As discussed more fully below, a union may also face liability under Title VII, § 1981, and the ADA if it breaches its duty of fair representation. As to such claims, the statute of limitations under Title VII, § 1981, and the ADA—not the six-month statute of limitations for breach of duty of fair representation—controls. *See Blaizin v. Caldor Store #38*, No. 97 Civ. 1604, 1998 WL 420775, at *2 (S.D.N.Y. July 27, 1998) (applying the Title VII statute of limitations period for claim that a union's failure to represent plaintiff on his grievance constituted an endorsement of plaintiff's employer's discriminatory actions in violation of Title VII); *see also Morris*, 994 F.Supp. at 171 (utilizing the statute of limitations period under Title VII to bar claim that the union retaliated against plaintiff for his activism and criticism of racial discrimination by the union); *Campbell v. General Motors Corp.*, No. Civ. 88–0071T, 1989 WL 152720 (W.D.N.Y. July 7, 1989) ("A claim for racially discriminatory failure to represent would ... be accorded the three-year statute of limitations applicable to § 1981 claims, rather than the brief six-month statute applicable to generic violations of the duty of fair representation."). Thus the claims Nweke has brought against the

Unions attacking their representation of her are not time-barred.

## V. The Conspiracy Allegation Is Dismissed

 Nweke's allegation that the Unions discriminated against her on the basis of disability, sex, and race by conspiring with Prudential to permit her discharge to stand is dismissed because it is vague and conclusory. Allegations of conspiracy must be pleaded with particularity or they will not survive a motion to dismiss. Conclusory allegations are insufficient to meet "'the somewhat stringent pleading requirements of this Circuit'" when conspiracy is alleged. *Gilliard*, 597 F.Supp. at 1075 (citation omitted).

Nweke fails to establish any facts from which a conspiracy might be inferred. The conspiracy claim is therefore dismissed.[2]

## VI. The Unions' Motion for Summary Judgment As to the Claims Against Them Brought Pursuant to Title VII, § 1981, and the ADA Is Granted

Nweke's Complaint against the Unions stripped to its essentials concerns their alleged failure to represent her properly in the grievances that she initiated against Prudential, their ratification of Prudential's discriminatory conduct, and their retaliation against Nweke by failing to discuss her grievance or take it to arbitration. This conduct, claims Nweke, violated Title VII, § 1981, and the ADA.

Title VII provides that a labor organization shall not discriminate against any individual because of his race, color, religion, sex, or national origin, or cause or attempt to cause an employer to so discriminate against an individual. *See* 42 U.S.C. § 2000e–2(c). Racial discrimination in employment is also prohibited by 42 U.S.C. § 1981. *See Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 459–60, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975). The Supreme Court has recently acknowledged that

**2.** The conspiracy claim could also be dismissed under the analysis that follows.

certain private entities such as labor unions, which bear explicit responsibilities to process grievances, press claims, and represent members in disputes over the terms of binding obligations that run from the employer to the employee, are subject to liability under § 1981 for racial discrimination in the enforcement of labor contracts. *Patterson v. McLean Credit Union*, 491 U.S. 164, 177, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989). A labor union may not discriminate against an individual because he or she has a disability within the meaning of the ADA.

■■■ A union's breach of its duty of fair representation may render it liable under Title VII, § 1981, or the ADA. *See, e.g., Blaizin*, 1998 WL 420775, at *2; *Morris*, 994 F.Supp. at 169, *Ross v. Communication Workers of Am., Local 1110*, 91 Civ. 6367, 1995 WL 351462, at *5 (S.D.N.Y. June 9, 1995), *aff'd*, 100 F.3d 944 (2d Cir.1996). Additionally, a union's role in ratifying an employer's discriminatory practice could be sufficient to compel a finding of liability against it. *See James v. Local 32B–32J, Serv. Employees Int'l Union, AFL–CIO*, No. 86 Civ. 0197, 1987 WL 33622, at *2 (S.D.N.Y. Dec.28, 1987); *see also United States v. City of Buffalo*, 457 F.Supp. 612, 639 (W.D.N.Y.1978) ("Tacit union acquiescence in an employer's discriminatory practices is sufficient to render it liable."). The breach of fair representation allegations and the condonation or ratification allegations will be discussed in turn.

### A. Allegations That the Unions Breached Their Duty of Fair Representation in Violation of Title VII, § 1981, and the ADA

■■■ It has been held that in order to establish a Title VII claim concerning representation by a union of its members' interests, "it is axiomatic that ... there must first be a finding that the [union] breached its duty of fair representation." *Martin v. Local 1513 and District 118 of the Int'l Ass'n of Machinists and Aerospace Workers*, 859 F.2d 581, 584 (8th Cir.1988), quoted in *Ross*, 1995 WL 351462, at *5. The duty of fair representation requires a union to represent all members of its bargaining unit honestly and in good faith, without hostility, discrimi-

nation, or arbitrary conduct. *See Vaca v. Sipes*, 386 U.S. 171, 177, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). A union breaches this duty when its "conduct toward a member of the collective bargaining unit is arbitrary, discriminatory or in bad faith." *Id.* at 190.

The Fifth Circuit Court of Appeals explained in *Causey v. Ford Motor Co.*, 516 F.2d 416, 425 n. 12 (5th Cir.1975), that the standards delineated in *Vaca* concerning duty of fair representation claims apply to Title VII claims against a union as well. The *Causey* court stated that:

> The union's duty of fair representation as to the processing of grievances arises within the context of the [LMRA] and must be distinguished from the union's duty to employees covered by Title VII[, 42 U.S.C. § 2000e–2(c)(1),] not "otherwise to discriminate" against members in processing grievances. The fair representation duty under the LMRA, as enumerated in *Vaca*, overlaps the Title VII protection, and the *Vaca* standards (proscribing arbitrary, discriminatory, and bad faith conduct) apply in Title VII cases.

*Id.* (citations omitted); *see also Doolittle v. Ruffo*, 88–CV–1175, 1996 WL 159850, at *4 (N.D.N.Y. Mar.27, 1996) (stating that a plaintiff must show that the unions breached their duty of fair representation before he or she may prevail on a claim that the unions violated Title VII by failing to follow through on plaintiff's grievance); *Tabois v. CWA Local 1101*, No. 89 Civ. 4921, 1992 WL 131038, at *4 (S.D.N.Y. June 1, 1992) (explaining that where plaintiff alleged the union violated Title VII by failing to represent him fairly in the grievance process on account of his sex, race, and national origin, "a finding of a [duty of fair representation] breach [is] essential to the existence of the Title VII claim" (citation omitted)).

The Seventh Circuit Court of Appeals has enunciated a test for evaluating Title VII claims based upon a breach of the duty of fair representation. In *Bugg v. International Union of Allied Indus. Workers, Local 507*, 674 F.2d 595, 597 (7th Cir.1982), the plaintiff alleged, *inter alia*, that the defendant union had breached its duty for fair

representation due to racially discriminatory reasons. The court held that:

> To establish a claim against the Union, the plaintiff was required to show: (1) that the company committed a violation of the collective bargaining agreement with respect to the plaintiff; (2) that the Union permitted the breach to go unrepaired, thus breaching its own duty of fair representation; [and] (3) that there was some indication that the Union's actions were motivated by racial animus.

*Id.* at 598 n. 5; *see Ross,* 1995 WL 351462, at *6 (citing *Bugg* test with approval).

■ Recently, the court in *Morris* adopted a two-part test applicable to Title VII duty of fair representation cases that was enunciated in *Doolittle:*

> [T]his court concludes that in this circuit the first prong of the *Bugg* test is not necessary to plaintiffs' establishment of a *prima facie* case that the Union Defendants breached their duty of fair representation and thus violated Title VII. Instead, plaintiffs must satisfy a two-prong test. They must demonstrate (1) that the Union Defendants breached their duty of fair representation by allowing an alleged breach to go unrepaired and (2) that the Unions Defendants' actions were motivated by gender animus.

*Morris,* 994 F.Supp. at 170 (quoting *Doolittle,* 1996 WL 159850, at *4); *see Blaizin,* 1998 WL 420775, at *2 ("It is well established that a duty of fair representation claim can fall within Title VII if a union allowed the breach to go unrepaired and plaintiff can show that the Union's actions were motivated by discriminatory animus."). This standard will be applied to the instant case as to the claims under Title VII, as well as those under § 1981 and the ADA.

### 1. *Permitting an Alleged Breach to Go Unrepaired*

■ Nweke contends that the Unions permitted the taking away of her policies and commission credits by Prudential, as well as her discharge, to go unrepaired when they failed to submit her grievances to arbitration. The Complaint alleges that the "grievances were allegedly processed to the 'Presidents' Committee' state—the final step before arbitration—without settlement, however, INTERNATIONAL and LOCAL 888 failed to process the grievances further or make demand for arbitration." (Compl.¶ 26.)

### a. *The 1994 Grievance*

There is no material issue of fact concerning whether the Unions allowed a breach to go unrepaired with respect to their handling of the 1994 grievance. The 1994 grievance Local 888 filed on Nweke's behalf addressed all of the issues she raised with it following her March 2, 1994 return to work. Nweke's letters provide the most reliable evidence of her concerns at that time. For the most part, she complained of not receiving the remainder of her disability payments, and the Unions considered the grievance to principally concern disability pay. Nweke also complained about excessive oversight by her new sales manager Harte. Further, Nweke complained that her persistency rate suffered in her absence. She complained as well of vandalism of her agency and referred to fifteen policies. Nweke complained that Martinez gave orders that payroll checks be generated while she was on disability leave, and about not getting March 2 to April 22, 1994 pay, which she described as readjustment pay.

The Unions assert that before and after the filing of the 1994 grievance, Local 888 representatives regularly communicated with Nweke and contacted Prudential district manager Martinez, employee disability unit claim manager Donald Carter, and field operations consultant Dana Lombardi regarding the concerns raised by Nweke. According to Nweke, Provenzano handled her May 1994 grievance in a grossly incompetent and inept manner. The record, however, indicates otherwise. For instance, although Provenzano did not have authority to review Prudential records, he spoke with Prudential's managers to urge them to review Nweke's concerns.

Indeed, all of the issues contained in the 1994 grievance were addressed and substantially resolved. First, on April 28, 1994, Nweke received an optional long-term disability benefit payment for her absence from January 25, 1994, through March 1, 1994.

Second, there was no readjustment pay due Nweke following her return from disability leave. Rather, any money in her commission account would have been released for payment to her after having been frozen during her leave of absence. It is telling that Nweke failed to identify any CBA clause or Prudential policy in support of her allegation that she was owed readjustment pay and was unable to explain the source of such pay at her deposition. As the Unions pointed out, an agent gets disability payments while on disability leave and, upon return to work, she gets commissions which had been placed on hold during her leave. Prudential stated in the October 7, 1994 response to the 1994 grievance that all payments due Nweke had been made.

Third, by its October 7 letter, Prudential notified the Unions that it had requested that cases reinstated to other agents during Nweke's disability leave be returned to her credit, and Provenzano informed Nweke of Prudential's response. Nweke herself acknowledged to Provenzano that certain policies were returned to her.

Fourth, in its October 7 letter, Prudential denied instructing anyone to withhold Nweke's checks, explaining that payroll checks were generated for Nweke since her STD ended on January 24, 1994, and that she refused to accept the checks. Nweke admitted that she refused six weeks of checks handed to her upon her return to work on March 2, 1994. Finally, Prudential denied the grievance allegation that Martinez requested leave of absence for Nweke without consultation with her.

Examination of the types of complaints Nweke made to the Unions in 1994 before and during the pendency of the 1994 grievance, the Unions' communication with her and Prudential regarding the grievance allegations, and Prudential's resolution of the grievance, as reported in the October 7, 1994 letter to Provenzano, demonstrates that the Unions fulfilled the duty of fair representation owed Nweke in processing the grievance.

It bears noting that the 1994 grievance did not challenge Nweke's placement on the LPP. Regardless, the claim of discriminatory placement, as found above, is time-barred.

Nweke's claim that the Unions breached their duty of fair representation by not submitting the grievance to arbitration fails as the issues were substantially resolved. Moreover, the record is devoid of evidence indicating that the Unions acted with hostility, discriminatorily, or arbitrarily, and in so doing, permitted a breach to go unrepaired. *See generally Vaca,* 386 U.S. at 177, 87 S.Ct. 903; *Morris,* 994 F.Supp. at 170.

### b. *The 1995 Grievance*

The Unions also fulfilled their duty of fair representation to Nweke in processing her 1995 termination grievance. Provenzano mailed Nweke a termination grievance the very day she was discharged. He instructed her to meet with the district office chairman or shop steward to sign and present the grievance to her district manager. Nweke admitted receipt of the grievance but refused to sign it because she considered it insufficiently detailed. According to Nweke, although she itemized her grievances in her letter dated April 19, 1995 to Provenzano, in his letter to Prudential dated June 22, 1995, and July 10, 1995, Provenzano maintained that only the main issues are listed on a grievance form.

The grievance was untimely due to Nweke's refusal to sign and file the grievance within the fourteen-day filing period set forth in the CBA. Yet, although he had not received a copy of the grievance indicating its submission to Prudential, Provenzano wrote Prudential so as to explain the problems with getting Nweke's grievance filed and pressed the merits of the grievance. Thereafter, once it was established that the grievance was untimely, the International reached an agreement with Prudential to treat it as timely.

The International then pursued Nweke's grievance to the President's Committee, the top step of the grievance procedure. At that meeting, the International questioned Prudential about the claim that first year commission credits due Nweke were given to other agents. In response, Prudential reexamined Nweke's first year commission credits to ensure that her 1993 production was

credited with all the first year commission credits properly due her. Following its review, Prudential determined that Nweke was properly placed on LPP.

Given that the Unions promptly initiated Nweke's termination grievance and began its processing even while she failed to file it properly, that they made various contentions to Prudential during the grievance process, including the correctness of the net first year commission credit figure which was the basis of her placement on probation, that Nweke's probation was proper, given her bottom 20% prorated 1993 production, and that she failed to meet the production requirements of her probation, the Unions fulfilled the duty of fair representation owed Nweke with respect to her discharge grievance.

Nweke persists that the Unions should be liable for failing to submit the grievance to arbitration. However, Nweke has not established that the Unions "arbitrarily ignore[d] a meritorious grievance or process[ed] it in perfunctory fashion." *Gold v. Local Union No. 888, United Food and Commercial Workers Int'l Union,* 758 F.Supp. 205, 207 (S.D.N.Y.1991).

It has been held that:

[E]very union decision which may in some way result in overriding the wishes or disappointing the expectation of an individual employee, or even an appreciable number of employees, does not in and of itself constitute a breach of fiduciary duty of fair representation. . . . Thus, where the union, after a good faith investigation of the merits of a grievance, concludes that the claim is unsubstantial and refuses to encumber further its grievance channels by continuing to process the unmeritorious claim, its duty of fair representation may well be satisfied.

*Local Union No. 12, United Rubber, Cork, Linoleum & Plastic Workers of Am. v. NLRB,* 368 F.2d 12, 17 (5th Cir.1966), quoted in *Ross,* 1995 WL 351462, at *9.

 Furthermore, a union member does not have an absolute right to have her grievance taken to arbitration. Rather, a union maintains discretion over its grievance machinery and the decision of whether to invoke arbitration. *See Vaca,* 386 U.S. at 191, 87 S.Ct. 903; *see also Lewis v. Tuscan Dairy Farms, Inc.,* 25 F.3d 1138, 1143 (noting that a union's duty of fair representation "does not require it to take every employee grievance to arbitration"); *De Gennaro v. New York City Hous. Auth.,* No. 92 Civ. 3985, 1995 WL 37850, at *6 (S.D.N.Y. Jan.31, 1995) ("[T]o preserve the value of the arbitration process, unions must be accorded wide discretion to determine, in a good faith, non-arbitrary manner, whether a particular grievance warrants arbitration.").

In light of the circumstances, the Unions's decision not to further process the grievance because they did not believe that they would prevail in arbitration was not a breach of their duty.

Having found that Nweke has failed to create a factual dispute as to whether the Unions, in handling the 1994 and 1995 grievances, breached their duty of fair representation by allowing a breach by Prudential to go unrepaired, the discriminatory animus prong of the test need not be reached. In any event, it is briefly discussed below.

### 2. *Discriminatory Animus*

 Although Nweke alleges that the improper processing of her grievances was motivated by disability, gender, and racial animus, the record fails to support the notion that her grievances were handled differently from those made by female employees who were not pregnant, male employees who return from disability leaves of absence, or white or other non-black employees. Nweke has submitted no statistical data concerning the Unions' handling of grievances from which it could be inferred that the Unions have breached their duty of fair representation in a discriminatory manner. *See Campbell,* 1989 WL 152720, at *2 (granting summary judgment to defendant union in an action where plaintiff claimed that union's failure to represent him properly in all the grievances initiated against his employer was racially motivated); *see also Ross,* 1995 WL 351462, at *14 (granting summary judgment to defendant union, noting that plaintiff "has not submitted any evidence sufficient to raise a question of fact as to whether the [union]

has treated her differently from similarly situated employees"); *Frank v. New York State Elec. & Gas,* 871 F.Supp. 167, 173 (W.D.N.Y.1994) (granting summary judgment to union on employee's § 1981 claims and stating that "in order to succeed on his claim that the union's failure to take his claim to arbitration was the result of racial discrimination, plaintiff must show at a minimum that the union treated grievances of similarly situated white employees differently"). Nweke also has not included evidence of discriminatory comments, innuendo, or stereotyping on the Unions' behalf.

Additionally, there is no probative evidence that the Unions exhibited hostility toward Nweke based on her race, sex, or alleged disability. The only evidence regarding race involving the Unions and Nweke was her informing Provenzano of her charge that Martinez left magazines featuring cover photographs of successful black women on her desk and that she was offended by it. In response to Provenzano's questioning, Nweke admitted that no one saw Martinez leave the magazines on her desk. There is a similar absence of record evidence of any hostility against Nweke based on her sex or choice to become pregnant and have an child.

Moreover, the record contains no material evidence of disability-based hostility by the Unions against Nweke. Nweke alleges in her deposition testimony, without the benefit of evidence of context or date, that she told Provenzano that she was sick and he responded that she should see a doctor if she was sick. Nweke also points to Provenzano's comment in a letter to the International that "the D.O.C. advises me her problems are mental" in discussing his frustration at Nweke for refusing to meet with the union representative to sign and present her termination grievance to Prudential.

Even assuming Provenzano made these comments, Nweke's allegations do not preclude the entry of summary judgment in the Unions' favor. These two remarks are insufficient to create a genuine factual dispute with respect to disability-based hostility toward Nweke by the Unions. First, the comments are isolated. Second, the Unions urge that Provenzano was sympathetic to Nweke's

grievance and remained so even after she filed NLRB and EEOC charges against Local 888. Third, Nweke has not shown any link between the remarks and any action or inaction on the part of the Unions. *See Ross,* 1995 WL 351462, at \*13.

Finally, no animus can be reasonably inferred from the Unions' refusal to arbitrate Nweke's discharge grievance, as the right to arbitration is not absolute. Accordingly, there is no genuine issue of fact that the manner in which the Unions processed Nweke's grievances was discriminatorily motivated.

**B. Allegations That the Unions Condoned or Ratified Prudential's Discriminatory Practices**

The Complaint states that the Unions "intentionally discriminated against [Nweke] on the basis of [her] disability, sex and race, by failing to investigate or prevent PRUDENTIAL'S discriminatory conduct . . . by condoning, inducing, authorizing or ratifying said discriminatory conduct." (Compl.¶ 25.) According to Nweke, for the purpose of not antagonizing management, the Unions refused to challenge or put a stop to the race, sex, and disability discrimination she was subjected to by Prudential. Such behavior could suffice in finding union liability. *See James,* 1987 WL 33622, at \*2. However, Nweke must carry the initial burden under Title VII, § 1981, and the ADA of establishing a *prima facie* case of discrimination. *See id.* After all, the Unions cannot be said to have condoned or ratified a discriminatory practice absent a showing of discrimination on the part of Prudential. Nweke has failed in this endeavor.

**1. The Title VII and § 1981 Claims**

Under Title VII, Nweke alleges both race and sex discrimination. To establish a *prima facie* claim of wrongful termination under Title VII, Nweke must show that (1) she is a member of a protected class; (2) she was qualified for the employment position; (3) she suffered an adverse employment action; and (4) the action occurred under circumstances giving rise to an inference of race or sex discrimination. *See Viola*

*v. Philips Med. Sys.*, 42 F.3d 712, 716 (2d Cir.1994) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). Nweke may satisfy the last prong by demonstrating that similarly situated employees outside of her protected class were treated differently. *See Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 63 (2d Cir.1997) (citing *Luciano v. Olsten Corp.*, 110 F.3d 210, 215 (2d Cir.1997)). Nweke may also prove that the Unions had a discriminatory intent or motive. *See Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1041 (2d Cir.1993). Nweke must prove the *prima facie* case by a preponderance of the evidence. *See Hansen v. Dean Witter Reynolds, Inc.*, 887 F.Supp. 669, 672 (S.D.N.Y. 1995) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)).

■ Under Title VII, Nweke can demonstrate discrimination through evidence of either "disparate treatment" or "disparate impact." Disparate treatment requires purposeful discrimination. Disparate impact, on the other hand,

> is based upon the premise "that some employment practices, adopted without a deliberately discriminatory motive, may in operation be functionally equivalent to intentional discrimination." The evidence in "disparate impact" cases "usually focuses on statistical disparities, rather than specific incidents, and on competing explanations for those disparities."

*Cosgrove*, 9 F.3d at 1041 (quoting *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 986, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988)) (citations omitted).

■ The elements of a § 1981 claim mimic those of a Title VII disparate treatment claim. This means that a plaintiff may not create a *prima facie* claim of discrimination via evidence of disparate impact. Discriminatory intent or motive is required. *See Scelsa v. City Univ. of N.Y.*, 806 F.Supp. 1126, 1145 (S.D.N.Y.1992) (noting that elements of § 1981 claim are identical to those of a Title VII disparate treatment).

■ In the instant case, Nweke has provided no evidence of intentional discrimina-

tion or disparate impact discrimination by Prudential based on sex. The record does not contain any probative evidence—only unsupported allegations—that Nweke was treated less favorably than male agents who were on or returned from disability leaves of similar duration, that she was treated less favorably than males with respect to the maintenance of the agencies during the leaves, that she was treated less favorably than males with respect to the calculation of production for purposes of determining placement on LPP, that she was treated less favorably than males with respect to the requirements imposed during the probation year following LPP, or that a male employee in her shoes would not have been discharged.

Granted, Nweke alleges that Prudential managers Martinez and Zaia made remarks based on sexual stereotypes. Yet Nweke has failed to produce evidence that Prudential relied on gender with regard to the maintenance of her agency, the calculation of her production for the purpose of determining placement on LPP, the imposition of requirements during her probation, or its decision to terminate her employment.

Additionally, as to the racial discrimination claim, Nweke herself confirms that her racial discrimination claim against Prudential is premised on the placement on her desk of magazines with black females pictured on the covers. This is insufficient to establish racial discrimination upon which her termination was based, or the existence of a racially hostile work environment.

## 2. *The ADA Claims*

Nweke submits that the Unions and Prudential violated the ADA by refusing to accommodate her disability and by subjecting her to intentional discrimination because of her disability. The Unions counter by contending that upon Nweke's return to work in March 1994 until the time of her discharge, Nweke was not a qualified individual with a disability within the meaning of the ADA and that the Unions had no information that Nweke was disabled following her return to work.

The ADA prohibits employment discrimination against a qualified individual based on that individual's disability. *See* 42 U.S.C. § 12112(a). To survive a defendant's motion for summary judgment on a disability discrimination claim, the plaintiff must establish a *prima facie* case of discrimination under the ADA "by producing evidence sufficient to support a reasonable inference of disability discrimination." *See Johnson v. New York Medical College,* No. 95 Civ. 8413, 1997 WL 580708, at \*4 (S.D.N.Y. Sept.18, 1997); *see Lyons v. Legal Aid Soc'y,* 68 F.3d 1512, 1515 (2d Cir.1995).

■ To meet her burden, Nweke must show that (1) she is an individual with a "disability" as defined by the ADA, (2) she is otherwise qualified to perform the basic functions of her job, and (3) she was discriminated against because of her disability. *See Reeves v. Johnson Controls World Servs., Inc.,* 140 F.3d 144, 149–50 (2d Cir.1998); *Ryan v. Grae & Rybicki, P.C.,* 135 F.3d 867, 869–70 (2d Cir.1998); *Wernick v. Federal Reserve Bank of N.Y.,* 91 F.3d 379, 383 (2d Cir.1996); *Heilweil v. Mount Sinai Hosp.,* 32 F.3d 718, 721 (2d Cir.1994). "Disability" is defined under the ADA as one of three things: (A) a physical or mental impairment that substantially limits one or more of the major life activities; (B) a record of such impairment; or (C) being regarded as having such an impairment. *See* 42 U.S.C. 12102(2).

■ Although the papers submitted by both parties focus on the first definition of disability, Nweke appears to base her claim on all three definitions. The Complaint states that "she has a record of or is regarded as having a physical and mental impairment that substantially limits one or more of her major life activities, in that [Nweke] suffered a physical and mental disability, to wit: acute bilateral arthralgia and neurotic depression." (Compl. ¶ 12 .)

According to Nweke, she began to receive treatment for depression in May 1993, and was diagnosed with neurotic depression and postpartum depression in October 1993 and major depression in December 1993. Nweke proposes that in March 1994 and in 1995, when she was discharged by Prudential, the depression was severe and substantially limited her ability to work, take care of herself, concentrate, or think clearly. Since the evidence provided by both parties fail to consider Nweke's bilateral arthralgia, her depression will be the focus in analyzing Nweke's claim under the ADA.

Assuming depression is a mental impairment, Nweke has failed to carry her burden in establishing that this impairment substantially limited a major life activity. The ADA does not define "major life activities" or "substantial limit[ation]." However, the regulations promulgated by the EEOC under the ADA provide an explanation of these terms. As the Second Circuit has indicated, "[w]hile these regulations are not binding, they provide us with guidance in interpreting the ADA." *Ryan,* 135 F.3d at 870 (citing *Francis v. City of Meriden,* 129 F.3d 281, 283 n. 1 (2d Cir.1997) (stating that great deference is owed EEOC regulations interpreting the ADA)). The regulations define "major life activities" as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). Here, Nweke's claim is principally premised on the ability to work.

"Substantially limits" is defined as:

(i) Unable to perform a major life activity that the average person in the general population can perform;

(ii) Significantly restricted as to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1). The regulations further counsel that:

[t]he following factors should be considered in determining whether an individual is substantially limited in a major life activity:

(i) The nature and severity of the impairment;

(ii) The duration or expected duration of the impairment; and

(iii) The permanent or long term impact, or the expected permanent or long term

impact of or resulting from the impairment.

*Id.* § 1630.2(j)(2).

■ "The ADA's requirement that, in order to constitute a disability under its terms, an impairment must substantially limit a major life activity underscores that 'the impairment must be significant, and not merely trivial.'" *Reeves,* 140 F.3d at 151 (quoting *Sutton v. United Air Lines, Inc.,* 130 F.3d 893, 898 (10th Cir.1997) (citation omitted)). The ADA does not consider every impaired person to be disabled. Thus, in determining whether a plaintiff has a disability within the ADA, "courts have been careful to distinguish impairments which merely affect major life activities from those that substantially limit those activities." *Ryan,* 135 F.3d at 870.

■ Nweke alleges—for the first time in her June 5, 1998, affidavit in response to summary judgment, according to the Unions—that from the date she returned to work on March 2, 1994, to March 24, 1995, when she was discharged, her depression substantially limited her major life activities of sleep, appetite, motivation (including focus and concentration), desire to socialize, and work. Yet her own words assessing her condition in 1994 contradict the assertions of substantial limitation she now makes in affidavit form. "The rule is well-settled in this circuit that a party may not, in order to defeat a summary judgment motion, create a material issue of fact by submitting an affidavit disputing his own prior testimony." *Trans–Orient Marine Corp. v. Star Trading & Marine, Inc.,* 925 F.2d 566, 572–73 (2d Cir.1991).

In fact, in 1994, Nweke failed to disclose any illness which substantially limits the major life activities of sleep, appetite, motivation, or desire to socialize during her final year of employment. In this regard, Nweke wrote three letters to Martinez during the first one-and-a-half weeks following her March 2, 1994, return to work. On March 3, 1994, she wrote that she was unable to work in January 1994 because she could not concentrate, focus, or make house calls, but she does not say that she remained in that condition when she returned to work in March

1994. In her March 11, 1994, letter to Martinez, Nweke states that she was sick in the last year and could not return to work, but does not say that she is still sick. In her March 8, 1994, letter to Martinez, Nweke confirms that "I have endured and overcome, especially in this past one year ."

Additionally, in her March 23, 1994 letter to Provenzano to which she attached two physician statements, Nweke spoke of her illness in the past tense, proclaiming that "the pregnancy was difficult and I was sick. After the baby, she was sick and I was sick." She failed to mention any current illness. Nweke clutches onto the two physicians' statements attached to the letter as support for her contention that she was receiving psychotherapy for depression and that she was on 20mg of Prozac daily. However, the two physicians' statements were dated January 31, 1994, and February 15, 1994, respectively. Both statements certify Nweke to return to work on March 2, 1994, and the latter statement certified that she may return to work full-time. Accordingly, there is no issue of fact as to whether following her return to work on March 2, 1994, she was substantially limited in the major life activities of sleep, appetite, motivation, and desire to socialize with others. *See Ryan,* 135 F.3d at 871–72 (finding that an impairment that caused periodic limitation on the ability to care for self was not a substantial limitation on the ability to care for self when plaintiff was still able to get dressed, groomed, and get to work).

> While courts recognize that depression and other emotional disabilities may in some circumstances qualify as an impairment under the ADA, merely indicating that [Nweke] was emotionally disturbed at some time in [her] life does not establish that [she] suffers from a mental impairment which substantially limits one or more of [her] major life activities.

*Calvarese v. City of Oswego,* No. 96–CV–602, 1998 WL 315091, at *2 (N.D.N.Y. June 10, 1998).

Moreover, Nweke fails to offer any evidence that she was substantially limited in working from the time of her March 2, 1994

return to work through the date of her discharge on March 24, 1995. In analyzing whether Nweke's major life activity of working was substantially limited, Nweke's impairment must not only limit the performance of a "single, particular job," but rather must limit employment generally. *See Heilweil*, 32 F.3d at 722; *Glowacki v. Buffalo Gen. Hosp.*, 2 F.Supp.2d 346, 351 (W.D.N.Y. 1998); 29 C.F.R. § 1630.2(j)(3)(I). Nweke has not demonstrated that her depression limited her employment generally. *See Wernick*, 91 F.3d at 383–84 (explaining that the inability to perform only current job is not a substantial limitation); *Adams v. Rochester Gen. Hosp.*, 977 F.Supp. 226, 232 (W.D.N.Y. 1997) (finding that while depression constitutes a mental impairment recognized by the ADA, the plaintiff was unable "to show that his depression substantially limited his ability to work not only at his existing job, but any job").

The letters Nweke wrote during the time between March 2, 1994, and her discharge on March 24, 1995, and even following her discharge, do not demonstrate any substantial limitation regarding her ability to work. In the March 11, 1994 letter to Martinez, Nweke states, "I will continue to work hard, bring in new business and make my own deposits." Thereafter, in a March 29, 1994 letter responding to her placement on LPP, Nweke affirms, "I do also fervently pray for the courage to turn in my resignation before I receive a Low Production letter if at any time I fall short because I cannot do the job." Several months later, in a September 2, 1994 letter to Prudential, Nweke states:

> I work and I produce every week at above average of production level. Although I only returned to work in March of 1994 this year, yet my current ranking of No. 19 in Sheepshead Bay Office of 59 agents is satisfactory. Besides both my persistency and renewal rates are steadily increasing more rapidly than 70% of this Agency force.

In the same letter, Nweke explains, "I continue to be productive. I have also sought to improve myself professionally by talking CLU courses." Toward the end of the letter, Nweke informs, "I have sought to promote my company through community volunteer services for the Verrazzano Nursing Home (I give 2 hours 15 minutes a week), Meals on Wheels organization (I give 2 hours a week), as well as my local church, The United Methodist Church." About six weeks later, in a handwritten note to Martinez, Nweke stated, "I am satisfied with my work. I still do volunteer work." Despite Nweke's assertion to the contrary, although Nweke's letters contained complaints, they fail to express any inability to do Prudential agent's work or any job either due to her depression or bilateral arthralgia.

Moreover, Nweke satisfied the production requirements of two quarters of her probation. Furthermore, in a letter to Nweke dated April 29, 1994, Prudential stated that Nweke's doctors' statements indicate that she was able to return to her duties as a Prudential representative on March 2, 1994. Nweke did not appeal that determination through the appeal procedure outlined in the same letter. Significantly, Dr. Miller's attending physician's statement dated February 15, 1994, the last physician statement received by Prudential before Nweke's return to work, indicated that Nweke was able to return to work on a full-time basis as of March 2, 1994. Dr. Miller stated that Nweke would have recovered sufficiently on that date to perform her duties at Prudential. The form used by Dr. Miller notified the physician about the short-hours program and provided a telephone number so that the physician could discuss the program with Prudential. There is no evidence that Dr. Miller contacted Prudential about such an accommodation. Furthermore, Dr. Miller indicated that the usual duration of Nweke's condition was three to six months. This limited duration also weighs against the finding of a disability under the ADA. *See generally* 29 C.F.R. § 1630.2(j)(2). The signed statement submitted by Dr. Miller, as well as Nweke's letters, demonstrate that Nweke was not substantially limited in her ability to perform a major life activity.

In light of Dr. Miller's 1994 diagnosis, his November 17, 1997, and June 5, 1998, statements contradicting his previous diagnosis of Nweke's 1994 impairment are insufficient to

create a genuine issue as to whether Nweke was substantially limited in the activity of working. Although Miller stated in 1998 that he recommended in 1994 that Nweke return to work on a modified work schedule, his February 15, 1994, physician's statement is devoid of any such recommendation. In Dr. Miller's recent statements, he asserts that Nweke's condition makes it difficult for her to perform in most jobs requiring complicated tasks of any kind. This statement is ambiguous as regards the period about which he is speaking. If the statement refers to March 1994, when he certified Nweke to return to work, then it is inconsistent and will be afforded little weight. If it refers to 1995, the time of her discharge, it also fails to bolster Nweke's claim because there is nothing in the record to indicate that Prudential or the Unions knew of such a diagnosis. The ADA prohibits discrimination based on a known disability, and a defendant cannot be held to violate the law based on medical evidence not revealed until four years later. *See Heilweil,* 32 F.3d at 724–25 (stating that the plaintiff cannot now bring information that she may have been suffering from a different condition when he was terminated when neither she nor her employer was aware of it).

The nature, severity, duration, as well as long-term impact, of Nweke's depression weigh against the finding of a substantial limitation. Nweke has not demonstrated that she was significantly restricted in the ability to perform her job at Prudential. Nweke stated in her 1994 letters and in four days of deposition testimony that she was performing satisfactorily during her final year of employment. Nor has she shown that at the relevant times she was restricted from employment in general. Indeed,

> the cases where depression has been held to substantially interfere with an individual's ability to work involve factual situations far more serious than the case at hand. [They regard situations where] the individual plaintiffs were repeatedly hospitalized, took numerous or extended leaves of absence from work, and depression repeatedly interfered with the plaintiff's ability to get to work on time and perform effectively.

*Johnson,* 1997 WL 580708, at *7 (citing, *inter alia, Guice–Mills v. Derwinski,* 967 F.2d 794 (2d Cir.1992)).

The facts above, especially the medical evidence, also support the proposition that Nweke did not have a record of an impairment. Turning to the third definition of disability, Nweke has not shown that she was "regarded as having such an impairment" pursuant to 42 U.S.C. § 12102(2)(C). The ADA defines a person as disabled when an employer "regard[s]" her as having an impairment "that substantially limits one or more ... major life activities." *Id.* § 12102(2)(A) & (C). Nweke has provided nothing to demonstrate that she was disabled because Prudential perceived her as being substantially limited in her ability to work, which again means a significant restriction in the "ability to perform either a class of jobs or a broad range of jobs." 29 C.F.R. § 1630.2(j)(3)(I). "An impairment that disqualifies a person from only a narrow range of jobs is not considered a substantially limited one." *Heilweil,* 32 F.3d at 723; *see also Wernick,* 91 F.3d at 383–84.

Thus, to survive the instant motion, Nweke bears the burden "of presenting evidence that [Prudential] perceived her to be incapable of working a broad range of jobs suitable for a person of her age, experience, and training because of her disability." *Ryan,* 135 F.3d at 872. She has presented no such evidence. Granted, Nweke was terminated because she failed to satisfy the LPP requirements. However, there is no indication that Prudential believed that she could not "keep up" because of her depression. Moreover, the discharge only indicated her deficient performance at *that* job. It did not evidence Prudential's view as to her inability to perform other jobs. Additionally, as to the Unions, Provenzano's statement to Nweke that he would get her a job at John Hancock negates a perception (by Local 888) of Nweke's inability to perform related jobs. *Cf. id.* at 872–73 (finding that the fact that plaintiff's employer was willing to provide her with a good employment recommendation suggests that it did not perceive her as being unable to perform related jobs).

Because Nweke was not disabled within the meaning of the ADA at the time relevant to her Complaint, the issue of whether she was "otherwise qualified" to perform her job need not be reached. As Nweke has not shown that Prudential discriminated against her due to her alleged disability, the Unions cannot face liability on a condonation or ratification theory.

### C. *The Retaliation Claim*

Title VII provides that "[i]t shall be an unlawful employment practice for . . . a labor organization to discriminate against any member thereof . . . because he has . . . participated in any manner in [a] . . . proceeding . . . under this subchapter." 42 U.S.C. § 2000e–3(a). In the context of retaliation claims, the statute forbids unions from taking retaliatory action because a member files a charge with a state agency or with the EEOC. *See Johnson,* 931 F.2d at 207.

According to Nweke, the Unions did just that. She contends that in retaliation for filing charges against Local 888 with the EEOC, the Unions failed to discuss her grievance or submit it for arbitration in violation of Title VII and the ADA.

 To make out a *prima facie* case of retaliation, Nweke must show that (1) she was engaged in an activity protected under Title VII and the ADA, (2) the Unions were aware of Nweke's participation in the protected activity, (3) Nweke suffered adverse union decisions, and (4) there was a causal connection between the her protected activity and the adverse action taken by the Unions. *See Malarkey v. Texaco, Inc.,* 983 F.2d 1204, 1213 (2d Cir.1993); *Burrell,* 894 F.Supp. at 760. The requisite causal connection may be established "indirectly by showing that the protected activity was closely followed in time by the adverse action," *Manoharan v. Columbia Univ. College of Physicians and Surgeons,* 842 F.2d 590, 593 (2d Cir.1988) (citing *Davis v. State Univ. of N .Y.,* 802 F.2d 638, 642 (2d Cir.1986)), or " 'through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, or directly through evidence of retaliatory animus directed against a plaintiff by the defendant.' " *Johnson v.. Palma,* 931

F.2d 203, 207 (2d Cir.1991) (quoting *DeCintio v. Westchester County Medical Ctr.,* 821 F.2d 111, 115 (2d Cir.1987)).

Nweke bears the initial burden of proving a *prima facie* case of retaliation by a preponderance of the evidence. If she succeeds, the burden shifts to the Unions to articulate some legitimate, nondiscriminatory reason for their actions. *See Hicks,* 509 U.S. at 507, 113 S.Ct. 2742; *McDonnell Douglas Corp.,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668; *Malarkey,* 983 F.2d at 1213. If the Unions carry this burden, Nweke then has an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the Unions were merely a pretext for discrimination. *See McDonnell Douglas Corp.,* 411 U.S. at 804, 93 S.Ct. 1817; *Sumner v. United States Postal Serv.,* 899 F.2d 203, 209 (2d Cir.1990).

Recently, the court in *Morris,* faced with a retaliation case against a union, applied a combination of the general retaliation standard and the two-pronged test adapted from *Bugg* which requires a showing that the union breached its duty of fair representation and that its actions were motivated by discriminatory animus. *See Morris,* 994 F.Supp. at 170 (citing *Gavenda v. Orleans County,* 95–CV–0251, 1997 WL 65870, at *5 (W.D.N.Y. Feb.10, 1997) (stating that "the plaintiff must first establish a *prima facie* case of . . . retaliation, which requires her to show, *inter alia,* that she . . . was engaged in a protected activity, that she suffered an adverse union action—viz., that the union breached its duty of fair representation—and that such adverse action occurred under circumstances giving rise to a reasonable inference of . . . retaliatory animus")). The court required the plaintiff to show that he was member of a protected group, that he engaged in a protected activity, and that the union breached its duty of fair representation. *See id.*

 Here, it is not disputed that Nweke participated in a protected activity when she filed the EEOC charge against Local 888 or that it was known to the union. However, the remaining elements of the *prima facie* case have not been established. Nweke has

not demonstrated that she suffered an adverse action because she filed the EEOC charge. She has not established that the Unions breached their duty of fair representation toward her because she filed the EEOC charge. "[A]n adverse employment action may be found where a plaintiff is deprived of the ability to expeditiously ascertain and enforce his rights under [a] collective bargaining agreement with his employer." *Johnson,* 931 F.2d at 207 (internal quotations omitted). However, as demonstrated above in discussing the duty of fair representation allegations against the Unions as to their handling of the 1995 grievance, Nweke has failed to proffer any evidence that the Unions refused to address or halted the taking of any action with respect to the 1995 grievance because Nweke filed a claim against Local 888.

Indeed, the essential adverse action alleged by Nweke is that the 1995 grievance was not subjected to arbitration. This action would only by "adverse" if the Unions refused to submit the claim to arbitration in violation of their duty of fair representation. As found above, they did not. Nweke has not shown that the Unions' conduct was "arbitrary, discriminatory, or in bad faith." *Vaca,* 386 U.S. at 190, 87 S.Ct. 903; *see Morris,* 994 F.Supp. at 170.

As the action taken by the Unions was not "adverse" in the sense required—in that they did not breach a duty of fair representation—Nweke has failed to carry her burden in establishing a triable retaliation claim. Thus summary judgment is granted in favor of the Unions.

### VII. *Nweke's Pendent State Law Claims Are Dismissed*

■ A district court may decline supplemental jurisdiction when it dismisses all claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(3). Since the federal claims have been dismissed, leaving no independent basis of jurisdiction over the remaining state claims brought pursuant to the NYHRL and the NYCCRL, they will also be dismissed. *See Purgess v. Sharrock,* 33 F.3d 134, 138 (2d Cir.1994); *Modeste v. Local*

*1199,* 850 F.Supp. 1156, 1167 (S.D.N.Y.1994), *aff'd,* 38 F.3d 626 (2d Cir.1994).

### *Conclusion*

For the reasons set forth above, the Complaint is dismissed as to the Unions, and the pendent state law claims are dismissed for lack of supplemental jurisdiction.

Submit judgment on notice.

It is so ordered.